## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**THE IT GROUP, INC.,** *et al.*<br><br>Post-Confirmation Estate. | Chapter 11<br><br>Bankruptcy Case No. 02-10118 (MFW)<br><br>Jointly Administered |

---

**JOHN ACCARDI,** *et al.,*

      Movants/Appellants,

    v.

**IT LITIGATION TRUST, successor in
interest to IT CORPORATION, IT GROUP,
INC., and their subsidiaries in bankruptcy,
ANTHONY DeLUCA, FRANCIS HARVEY,
HARRY SOOSE, and CARLYLE
PARTNERS II, LP,** *et al.,*

      Respondents/Appellees.

Civ. No: 04-146 (JJF) (lead case)
[consolidated with Civ. No. 04-147 (JJF)]

**Emergency Relief Requested
<u>Before October 17, 2005</u>**

No hearing requested – F.R.B.P. 8011(c)

---

**ROCHELLE BOOKSPAN**,

      Movant/Appellant,

    v.

**IT LITIGATION TRUST, successor in
interest to THE IT GROUP, INC.,** *et al.,*

      Respondents/Appellees.

---

**EMERGENCY *EX-PARTE* REQUEST OF THE ACCARDI APPELLANTS AND
ROCHELLE BOOKSPAN FOR TEMPORARY STAY OF ORDER RELEASING
IT TRUSTEE FROM RESERVE ORDER AND AUTHORIZING DISTRIBUTION OF
SCHEDULE C-1 RESERVE, AND FOR ORDER SETTING BRIEFING SCHEDULE;
MOTION FOR STAY, PENDING APPEAL, OF ENFORCEMENT OF ORDERS
DISMISSING ADVERSARY PROCEEDINGS, OF ORDER RELEASING
IT TRUSTEE FROM RESERVE ORDER AND AUTHORIZING DISTRIBUTION OF
SCHEDULE C-1 RESERVE; REQUEST IN THE ALTERNATIVE FOR
TEMPORARY STAY PENDING FILING OF REQUEST FOR EMERGENCY STAY
WITH UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

[Pages 1-35]

# TABLE OF CONTENTS

**SUMMARY OF *EMERGENCY* REQUEST FOR
IMMEDIATE RELIEF PENDING HEARING AND
REQUEST FOR BRIEFING ORDER**                                    1

Immediate Relief Requested: A Temporary Stay and
Briefing Order:                                                  3

**SUMMARY WHY STAY PENDING APPEAL
SHOULD BE GRANTED**                                              3

Relief Requested - Stay Pending Appeal or Temporary
Stay Pending Filing With Third Circuit                           5

**FACTS**                                                        6

**ARGUMENT**                                                     12

A.  A Stay of Enforcement of the Bankruptcy Court's
Dismissals Is Appropriate.                                       12

    1.  Claimants Are Likely to Succeed on Appeal
      and At Minimum Have Raised Substantial Issues on Appeal.    12

    2.  Claimants' Priority Claims, However Meritorious,
      Will Be Irrevocably Prejudiced/Mooted If the Schedule C-1
      Reserve Is Released and Distributed.                        19

    3.  The Terms of the Joint Plan, And the Actions of the
      IT Trustee Show No Substantial Harm Will Come to Any
      Appellee or Creditor.                                       21

    4.  The Stay Will Not Harm the Public Interest.              23

**REQUEST FOR RELIEF**                                           23

Statement Regarding Compliance with D. Del. L.R. 7.1.1.          24

A.  Proposed Order [Granting Temporary Stay/Briefing Schedule]   25

B.  Proposed Order [Granting Stay Pending Appeal]                29

**ADDENDUM - STATUTES, RULES AND REGULATIONS**                  33

## TABLE OF CASES/AUTHORITIES

**CASES:**

*ATO, Inc. v. PBGC*, 456 F. Supp. 545 (N.D. Oh. 1978),
*rev'd on other grounds*, 634 F.2d 1013 (6th Cir. 1980)          19

*Brillinger v. GE*, 130 F.3d 61 (2d Cir. 1997)          19

*Carabba v. Randall Food Mkts, Inc.*, 145 F. Supp.
2d 763 (N.D. Tex. 2000)          16

*Commission of IRS v. Keystone*, 508 U.S. 152 (1993)          19

*Connolly v. PBGC*, 581 F.2d 729 (9th Cir. 1978)          18

*Goldstein v. Johnson & Johnson*, 251 F.3d 433
(3d Cir. 2001)          4, 14

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999)          19

*Hunt v. Hawthorne Assoc., Inc.*, 119 F.3d 888 (11th Cir. 1997)          19

*In re Chateguay Corp.*, 988 F.2d 322 (2d Cir. 1993)          20

*In re Columbia Gas System, Inc.*, 1992 U.S. Dist.
Lexis 3253 (D. Del. 1992)          15

*In re Gleasman*, 111 B.R. 595 (Bankr. W.D. Tex. 1990)          13

*In re Highway Truck Drivers & Helpers Local Union # 107*,
888 F.2d 293 (3d Cir. 1989)          13

*In re New Valley*, 89 F.3d 143 (3d Cir. 1995)          14

*In re Polaroid Corp,* 2004 U.S. Dist. Lexis 1917 (D. Del. 2004)          13, 15

*In re Revere Copper & Brass, Inc.,* 78 Bankr. 17 (S.D.N.Y. 1987)          20

*In re Roth American, Inc.*, 90 B.R. 94 (M.D. Pa. 1988)          15

*In re VF Brands, Inc. v. The Money's Trust*, 282 B.R.
134 (D. Del. 2002)          13

*In re Westwood Plaza Apartments Ltd.*, 150 B.R. 163
(Bankr. E.D. Tex. 1993)          13

*In re Wymer*, 5 B.R. 802 (Bankr. 9th Cir. 1980)                                    13

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 1988)        15

*Lutin v. United States Bankruptcy Court*, 173 B.R. 467
(Dist. Ct. S.D.N.Y. 1994)                                                         20, 22, 23

*Lyons v. Georgia Pacific Corp. Salaried Employees Retirement
Plan,* 221 F.3d 1235 (11th  Cir. 2000)                                             19

*Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir. 1980)                          15

*Nachman Corp. v. PBGC*, 446 U.S. 359 (1980)                                      23

*PBGC v. Defoe Shipbldg. Co.*, 639 F2d 311 (6th Cir. 1981)                        18

*PBGC v. Gray Grimes Tool Co., Inc.*, 546 F. Supp. 102
(E.D. Mich. 1982)                                                                 18

*PBGC v. Quimet Corp.*, 470 F. Supp. 945 (D. Mass 1979)                           18

*United States v. Reorganized CF&I*, 518 U.S. 213 (1996)                          18


**STATUTES:**

11 USC § 101(5), (12)                                                             18

11 USC § 101(27)                                                                  18

11 U.S.C. § 362(a)                                                                17

11 U.S.C. § 507(a)(6) (1979)                                                      18

11 U.S.C. § 507(a)(8)                                                             5, 18

11 U.S.C. § 507(a)(8)(a)-(g) (1979)                                               18

29 U.S.C. § 1001 et seq.                                                          4

29 U.S.C. § 1001(a)                                                               23

29 U.S.C. § 1002(35)                                                              18

29 U.S.C. § 1081(a)(8)                                                    19

29 U.S.C. § 1082                                                          5

29 U.S.C. § 1082(a)(1)                                                   16

29 U.S.C. § 1082(c)(11)                                                  16

29 U.S.C. § 1082(e)(1)                                                   18

29 U.S.C. § 1082(f)(1)                                                   16

29 U.S.C. § 1082(f)(2)                                                   18

29 U.S.C. § 1082(f)(3)                                                   16

29 U.S.C. § 1082(f)(4)(B)                                                17

29 U.S.C. § 1082(f)(4)(C) (1987)                                       5, 17

29 U.S.C. § 1368                                                         17

**Other Authority**

App. A Collier on Bankruptcy (15th ed.) App. Pt. 3-61
(Rel. 60-12/96) (citing 11 USC § 104a.(4) (1898)) (Act of July 1,
1898, ch. 541, 64(a), 80 Stat. 271, 307)                                18

Fed. R. Bankr. Proc. 8005                                                13

Fed. R. Bankr. Proc. 8011(a)                                            15

Fed. R. App. Proc. 8(a)                                                  13

Fed. R. App. Proc. 8(a)(2)(B)(ii), (iii)                                15

H.R. Conf. Rep. No. 100-495, at 881-885, *reprinted in* 1987
U.S.C.C.A.N. at 2313-1627 to 2313-1631.                                  17

Pension Protection Act of 1987 § 9304(f)(4)(C): Subtitle D of
Title IX of the Omnibus Budget Reconciliation Act of
1987, Pub. L. No. 100-203, §§ 9301-9346, 101 Stat. 1330,
1330-331-1330-374 (Dec. 22, 1987)                                       17

Twenty-nine (29) participants in the IT Corporation Deferred Compensation Plan, John Accardi, *et al.*, and also Rochelle Bookspan ("Bookspan") (collectively the "*Accardi Appellants*" or "Movants"), hereby move *ex parte* and on an emergency basis pursuant to Fed. R. Bankr. P. 8005 for an immediate temporary stay of enforcement and of the order releasing the IT Trustee from the requirement that it maintain the Schedule C-1 Reserve and authorizing distribution of the Schedule C-1 Reserve in the amount of $3,146,427.93 plus interest provided for under a prior reserve order, pending the issuance of a briefing order by the District Court and disposition on this matter on the merits; move for entry of a stay pending appeal of enforcement of the United States Bankruptcy Court's final orders entered in February 2004, dismissing with prejudice the adversary proceedings captioned *John Accardi et al v. IT Litigation Trust*, Adv. No. 02-05486 MFW ("*Accardi Proceeding*") and *IT Litigation Trust et al. v. Rochelle Bookspan*, (Adv. No. 02-04756 MFW ("*Bookspan Proceeding*"), including a stay of the order releasing the IT Trustee from the requirement that it maintain the Schedule C-1 Reserve and authorizing distribution of the Schedule C-1 Reserve; and should the District Court deny the Motion for Stay, move in the alternative for a temporary stay regarding the foregoing pending the filing of a emergency motion for stay with the U.S. Court of Appeals for the Third Circuit (the "Motion for Stay").

## SUMMARY OF *EMERGENCY* REQUEST FOR IMMEDIATE RELIEF PENDING HEARING AND REQUEST FOR BRIEFING ORDER

On March 31, 2005, the District Court consolidated the appeals *Accardi et al. v. IT Litigation Trust* (Civ. No. 04-146 (JJF); the "*Accardi Appeal*"—lead case) and *Rochelle Bookspan v. IT Litigation Trust* (Civ. No. 04-147 (JJF); the "*Bookspan Appeal*"), and entered its order and opinion affirming the United States Bankruptcy Court's dismissal of the *Accardi Proceeding* and *Bookspan Proceeding*, *supra*, with prejudice.  The District Court

1

agreed with the lower court that the IT Corporation Deferred Compensation Plan ("DCP") is

an unfunded top-hat plan.  The Movants appealed to the United States Court of Appeals for

the Third Circuit (No. # 05-2191) ("Third Circuit Appeal"), where all briefing is complete.

Since then, on October 7, 2005, the Bankruptcy Court entered an order in the

Debtors' bankruptcy case (Ex. "20" at 301) sustaining a claim objection filed by the IT

Trustee disallowing a secured and priority proof of claim, # 6951, filed by Bookspan (one of

seven "Priority Claims" for unfunded contributions allegedly owing the DCP estimated to be

at least $3,146,427.93 plus interest), leaving the proof of claim with unsecured status.  (This

proof of claim asserts claims identical to certain Claims for Relief found in the second

amended complaint and second amended counterclaims filed in the *Accardi-* and *Bookspan-*

*Proceedings*, respectively, that were dismissed in February 2004, as noted *supra*).  The

Bankruptcy Court also authorized interim relief, a change of the *status quo* that had been in

place for the last year and 3 months: relying on the District Court's rulings, the lower court

authorized the release of the "Schedule C-1 Reserve," a reserve of $3,146,427.93 plus

interest created in July 2004 to pay in full the Priority Claims; and, contrary to its oral rulings

at the hearing[1], authorized the distribution of the $3,146,427.93; but also ordered the

automatic re-reserve of said amount out of litigation recoveries (e.g. out of 100 remaining

preference actions) if the Movants succeed before the Third Circuit ("Re-Reserve Order").

The Bankruptcy Court also denied the motion of the *Accardi Appellants* for stay pending

---

[1] The Accardi Appellants will file an emergency motion for reconsideration with the Bankruptcy Court seeking to correct/delete the Trustee's seeming authorization to distribute the Schedule C-1 Reserve of $3,146,427.93 (Ex. "20" at 306; ¶ 5), because a) the Trustee's counsel represented on the record on September 6, 2005, in connection with the Distribution Motion, that the Schedule C-1 Reserve was not included in the proposed distribution (i.e., the $3.1+ million would not be included in the distribution of $5,176,227 in "Available Funds"); and b) in response the Bankruptcy Court agreed with the Trustee's counsel that the Trustee would file a new, second motion to distribute, to distribute the Schedule C-1 Reserve.

appeal.  (All exhibits herein are attached to the accompanying declaration of Thomas A. Johnson)

This matter is extremely urgent.  The Movants will be irreparably harmed because of the bankruptcy doctrine of equitable mootness if the IT Trustee makes a distribution of the Schedule C-1 Reserve.  The lower court granted a 10-day stay of the Order under Fed. R. Bankr. P. 7062.  <u>If District Court does not enter a temporary stay before October 17, 2005, the IT Trustee could release the Schedule C-1 Reserve and promptly distribute the $3.1 million after that date, equitably mooting the Priority Claims</u>.

If the District Court does not enter a temporary stay pending disposition of the merits and a stay pending appeal or, at least, a temporary stay allowing the Movants to pursue a stay pending appeal with the Third Circuit, then the IT Trustee may release the reserve and make distributions that leave insufficient funds to re-reserve.  Irreversible prejudice will accrue to the above claims against the IT Trust due to the equitable mootness doctrine.  If the funds are distributed there will be no practical way for the Bankruptcy Court to recover the funds constituting the Schedule C-1 Reserve as there are thousands of unsecured creditors—even if the Movants claims are found meritorious by the Third Circuit.

### Immediate Relief Requested: A Temporary Stay and Briefing Order:

The *Accardi Appellants* request *ex parte* that the District Court immediately enter a temporary stay prohibiting the IT Trustee from releasing the Schedule C-1 Reserve and distributing the Schedule C-1 Reserve until the merits of the Motion for Stay can be addressed by this Court; and also order a briefing schedule.  See proposed order attached hereto.

### SUMMARY WHY STAY PENDING APPEAL SHOULD BE GRANTED

The Movants have presented novel, significant issues in connection with their appeal and are likely to succeed on the merits. The *Accardi Appellants* contend that the DCP is "funded" under § 1081(a)(3)[2] because the DCP in ¶ 12.1, in a provision never addressed in any decision in the United States, transferred discretion over "funding" to an administrative committee. Under the lowest possible standard under ERISA (*Goldstein v. Johnson & Johnson,* 251 F.3d 433 (3d Cir. 2001)), such discretion would be subject to a "good faith" standard, which prohibits forfeitures. As the only beneficiaries of the DCP are the participants and their designees, this funding discretion had to be exercised solely on their behalf. The CFO of the IT Group was always a Committee member, giving the Committee access to inside financial information of the company, so the funding discretion should have been exercised prior to the insolvency of the sole funding source, the "Employer" IT Corporation. Under the Trust for the DCP ("Trust"), exclusive-benefit funding could have occurred by making distributions directly to the participants, bypassing the Trust. IT Corporation and the Trustee also pre-approved amending the Trust to be an exclusive benefit trust in Trust ¶ 9.1(b)(i). Even if Trust ¶ 9.1(b)(i) were ambiguous as to whether the DCP is "funded," which it is not, attached is the declaration of Dr. James Mahoney (Ex. "22" at 315) evidencing that the President & CEO of the company promised to Dr. Mahoney and other prospective participants that the Trust would be "funded" solely for the participants' benefit if the company were ever on the verge of insolvency. As the participants' have rights under the DCP greater than those of unsecured creditors, the test for "funding" is satisfied and the DCP is subject to Parts III and IV of ERISA. These arguments are at the core of the appeal to the Third Circuit.

---

[2] All section references herein are to ERISA, Title 29 U.S.C. § 1001 *et seq*. unless noted.

Although <u>not</u> part of the appeal to the Third Circuit (and not disputed by the IT Trustee before the bankruptcy court), the DCP also satisfies all the elements of § 1082 necessary for recognition that unperfected liens arose for unfunded contributions, arising between 1996-2001, which are treated as priority claims in the bankruptcy case under § 1082(f)(4)(C) and 11 U.S.C. § 507(a)(8).  (See Section A.1.b. *infra*).  The Appellants are at substantial risk of irreparable injury if the IT Trustee is allowed to distribute the Schedule C-1 Reserve: there is a substantial risk that the Trustee may not recover sufficient funds from the preference actions to re-reserve; these funds might be surcharged by estate professionals; and the Trustee may distribute these funds before the Third Circuit rules.  The IT Trust and its creditors will not suffer irreparable injury keeping sufficient funds on hand, as only a short delay in making distributions is needed to obtain a final disposition from the Court of Appeals.  The delay is insignificant given the Trustee volunteered a year and 4 months ago to keep the Schedule C-1 Reserve in place.  This was the status quo during the entire appeals process, until upset by the Bankruptcy Judge on October 7, 2005.  Plus, the prosecution of preference actions and a D&O action, seeking over $70 million in recoveries, are also delaying the closing of the bankruptcy case.  The distribution of the $3.1 million Schedule C-1 Reserve constitutes a trifle of the total distribution, much less than $1/10^{th}$ of the already-meager 1% distribution, compared to the thousands of creditors that would receive it.  Over the last year and 4 months the Trustee has taken no action that suggests there is any urgency in distributing the Schedule C-1 Reserve.

### *Relief Requested - Stay Pending Appeal or Temporary Stay Pending Filing With Third Circuit*

The *Accardi Appellants* request that the District Court grant the Motion for Stay pending appeal.  (See proposed order)  If the District Court intends to deny the Motion for

Stay, the *Accardi Appellants* request that the District Court grant a temporary 20-day stay under Fed. R. Bankr. P. 8005, so the *Accardi Appellants* have time to prepare an emergency motion for stay pending appeal for filing with the Third Circuit, where under Local Appellate Rule 27.7 (Ex. "25" at 330), ten (10) days is allowed just for briefing expedited motions.

**FACTS**

1.    IT Corporation, the chief operating subsidiary of the IT Group, Inc. ("IT Group"), adopted the DCP (Ex. "1" at 045) and a purported rabbi-trust ("Trust") (copy at Ex. "2" at 065), eff. 1/1/96.

2.    On January 16, 2002, the IT Group and its 68 subsidiaries filed chapter 11 petitions ("Petition Date"), with 6,790 employees on the Petition Date.  (Ex. "3" at 092)

3.    On July 12, 2002, seven Accardi Claimants filed secured/priority proofs of claim for unfunded contributions owing the DCP ("Priority Claims").  (See Ex. "4" at 093)

4.    On July 23, 2002, the IT Group filed a complaint against Bookspan for declaratory relief ("*Bookspan Proceeding" supra)* that Bookspan had no interest in a $500,000 account created in a sale order entered in the bankruptcy case in April 2002.

5.    On September 4, 2002, 26 Claimants, including Bookspan, filed a complaint, initiating the *Accardi Proceeding*, *supra,* against the Appellees.  Three more Claimants later joined, for a total of 29 plaintiffs.

6.    On March 12, 2003, the Accardi Claimants filed their second amended complaint.  (Ex. "5" at 106)  They asserted a Fourth Claim for Relief for secured and priority claims, individually and on behalf of the DCP as a whole as permitted by ERISA, for unfunded contributions owing the DCP, § 1082(f)(4)(C), in an amount necessary to fund the

$2,162,221 in unpaid benefits listed in the complaint.[3]  (Ex. "5" at 112)  On March 18, 2003,

Bookspan filed second amended counterclaims against the IT Group in the Bookspan

Proceeding, simply attaching the second-amended complaint filed in the *Accardi Proceeding*.

On March 27, 2003, the defendants in the *Accardi Proceeding* filed a renewed consolidated

motion to dismiss under Fed. R. Civ. Proc. 12(b)(6) for failure to state a claim; the IT Group

filed an identical renewed motion in the *Bookspan Proceeding*.

   7.  On February 3, 2004, the Bankruptcy Court dismissed the *Accardi Proceeding*

and *Bookspan Proceeding* with prejudice per orders and an identical opinion filed in both in

*Proceedings*.  (See Exs. 6, 7, and 8 at 156, 158, 160)

   8.  On February 11, 2004, the *Accardi Claimants* and Bookspan each filed

notices of appeal to the District Court in their respective cases.

   9.  On April 6, 2004, the Bankruptcy Court confirmed the plan of liquidation

sponsored by the Debtors and the Official Committee of Unsecured Creditors (the "Joint

Plan").  One provision in the Joint Plan permits the estate's professionals to seek to surcharge

"Litigation Recoveries."  (Ex. "9" at 188; ¶ 7.22)  The IT Group and all of its subsidiaries in

bankruptcy have been substantively consolidated.  (Ex. "3" at 089; Ex. "10" at 191)  All of

the Debtors' assets were transferred to the IT Litigation Trust ("IT Trust").  *Id.*  Alix Partners

LLC was appointed the trustee ("IT Trustee").  The IT Trustee later substituted-in in place of

the Debtors in the appeals.  The Disclosure Statement for the Joint Plan contemplates a (1%)

distribution to unsecured creditors and payment in full of allowed priority claims.  Over

7,000 proofs of claim have been filed totaling over 16 billion.  (Ex. "10" at 192)

---

[3] After the Participants appealed to the District Court they later learned through discovery in
the bankruptcy cases that there are 65 participants owed about $3.1 million.  *See infra.*

10.     On June 8, 2004, the IT Trustee filed a reserve motion to set aside funds for disputed priority claims ("Reserve Motion").  In this motion the IT Trustee volunteered to hold $2,037,626 in reserve for the Priority Claims (see summary, Ex. "11" at 192), without having being requested to do so by the *Accardi Claimants*.  The Movants submitted updated information showing unpaid benefits per statements of account and proofs of claim for the 64 participants totaled over $3.1 million.  (See Soose Aff., Ex. "12" at 228)[4]  On July 28, 2004, the Bankruptcy Court ordered that $3,146,427.93 plus interest be reserved ("Reserve Order"), naming this reserve the "Schedule C-1 Reserve."  (Ex. "13" at 229; D.I. #5344)

11.     On March 31, 2005, the District Court consolidated the *Bookspan Appeal* with the *Accardi Appeal*, with the latter as the lead case.  (D.I. # 31)  The Court also entered an order and opinion affirming the lower court's decision dismissing the appeal. (Ex. "14" at 236 (certified copy)

12.     On April 8, 2005, the IT Trustee filed its 26th Omnibus Objection with the Bankruptcy Court objecting to Bookspan's Priority Claim # 6951 ("Claim Objection"), on the grounds that the District Court had affirmed the lower court.

13.     On April 15, 2005, the *Accardi Appellants* and Bookspan filed a notice of appeal of the District Court's order/opinion.  (Ex. "15" at 247; D.I. # 34 (certified))

14.     On April 21, 2005, the *Accardi Claimants* filed a motion for stay pending appeal with the lower court ("Motion for Stay").  Before the hearing on this motion and the Claim Objection on May 10, 2005, and for several months thereafter, the parties tried to negotiate an interim distribution of the Schedule C-1 Reserve with a re-reserve if the Movants succeed on appeal, but could not reach an agreement.  At a hearing on a disputed

---

[4] The Participants later learned Francis Harvey (an appellee owed $89,564) was excluded from this calculation.

interim order on July 27, 2005, the Bankruptcy Court continued the Claim Objection to September 6, 2005. On August 10, 2005, the *Accardi Claimants* re-filed the Motion for Stay as the lower court omitted mention of continuing it to September 6, 2005 as well.

15.    On August 17, 2005, the IT Trustee moved in the Bankruptcy Court to a) make a distribution to creditors ("Distribution Motion") (D.I. # 6230) of $5,176,227, the so-called "Available Funds" which did not include the Schedule C-1 Reserve; and b) modify the Reserve Order to eliminate the requirement that the IT Trustee maintain the Schedule C-1 Reserve ("Motion to Modify Reserve") (D.I. # 6232). In the latter the IT Trustee admits: "the Reserve Order effectively grants the Accardi Claimants a stay pending appeal . . . ." (Ex. "16" at 255)

16.    All briefing before the Court of Appeals was complete by August 25, 2005. In its Opposition Brief, the IT Trustee admitted that the Standard of Review applied by both lower courts was erroneous. (Ex. "17" at 261)

17.    On September 6, 2005, the Bankruptcy Court sustained the IT Trustee's Claim Objection and granted its Motion to Modify Reserve; it also denied the Motion for Stay. (See Transcript, Ex. "18" at 262) In the Distribution Motion the IT Trustee refused to provide assurances "that the Initial Distribution can be effected in late October 2005 as intended." (Ex. "19" at 298) On October 7, 2005, the Bankruptcy Court entered its order regarding the above rulings. (Ex. "20") The reasons for denial of the Motion for Stay are found in this order and in the transcript.

18.    Under the terms of the DCP,[5] IT Corporation is the "Employer" (Ex. "1" at 050; ¶¶ 1.17 and 1.12), and employed all 29 *Accardi Appellants*.  (Ex. "8" at 162)  Amounts were withheld from paychecks bimonthly.  (Ex. "1" at 053; DCP ¶¶ 3.1-3.4)

19.    The DCP establishes a 3-person administrative committee ("Committee"). (Ex. "1" at 058; DCP ¶ 10.1)  The Debtors admitted in pre-litigation discovery conducted in the bankruptcy case that the Committee members "consist[ed] of incumbents from the following management positions" at the IT Group including the "Chief Financial Officer" of the IT Group and all its subsidiaries, per policy set in 1996 (Ex. "21" at 311-12); and that Harry Soose was appointed to the Committee in August 1999.  (*Id.* at 312)  Mr. Soose filed an affidavit confirming that he was the CFO and a Committee member.  (Ex. "12" at 227; ¶ 4-8)

20.    The DCP transfers discretion over funding to the Committee:

"12.1    Establishment of Trust.  The Employers shall establish the Trust and *shall transfer over to the Trust **such assets, if any, as the Committee determines, from time to time and in its sole discretion***, are appropriate."

(Ex. "1" at 061) (emph. add.)  The DCP recognizes that the "Trust" to be used may be amended.  (Ex. "1" at 051; DCP ¶ 1.28)  The DCP states that the beneficiaries are those named in Article 7.  (*Id.* at 051; DCP ¶ 1.5)  Article 7 states the only beneficiaries of the DCP are the participants and their designees.  (*Id.* at 057; DCP Art. 7)  The DCP's "specified benefits" (*Id.* at 049; DCP Preamble) include repayment of all deferred salary and bonuses: In the section regarding benefits, "Retirement and Termination Benefits," *the first stated benefit is the repayment of the participants' "Account Balance" as a whole*, either as a

---

[5] As the appeals have been consolidated and papers filed in the *Bookspan Proceeding* duplicate the papers filed in the *Accardi Proceeding*, cites herein are generally to papers filed in the *Accardi Proceeding*.

"Retirement Benefit" or as a "Termination Benefit."  (*Id.* at 056; DCP ¶¶ 5.1, 5.2)  The

"Account Balance" is defined as the sum of all "Deferral Amounts" plus interest.  (*Id.* at 049;

DCP ¶ 1.1)  "Deferral Amounts" include all annual salary and bonus deferred**.**  (*Id.* at 050,

049; DCP ¶¶ 1.14, 1.3, 1.4, 1.2)  The participants are *100% vested*.  (*Id.* at 054; DCP ¶ 3.8)

Both the DCP and the Trust are signed by the employer/sponsor IT Corporation.  (*Id.* at 064;

Ex. "2" at 084)

      21.     IT Corporation agreed in the Trust that certain amendments would not be

allowed, but an exclusive benefit amendment was explicitly permitted:

> "(b) . . . [T]his Master Trust Agreement shall *not* be amended by an
> amendment that would:
>     (i)    Cause any of the assets of the Trust to be used for or diverted to
> purposes ***other than for the exclusive benefit of Participants and
> Beneficiaries as set forth in the Plans***, except as is required to satisfy the
> claims of the Company's or a Subsidiary's general creditors."

(Ex. "2" at 081; Trust ¶ 9.1(b)(i)) (emph. add.)  The Committee also had discretion to amend

the DCP to be an exclusive benefit trust (Ex. "1" at 058; DCP ¶ 10.1), with full control over

the trustee, and all aspects of trust administration (Ex. "2" at 071, 076; Trust ¶ 2.1, 3.6(b))

including the making of distributions:  "[T]he Committee shall direct the Trustee as to the

administration of the Trust in accordance with the following provisions."  (*Id.* at 071; Trust

¶ 2.1)  One provision is: "The Trustee may conclusively rely upon directions from the

Committee in taking *any action . . . including the making of payments from the Trust Fund. . .*

*.* The Trustee shall have no liability for actions taken . . . on the direction of the Committee."

(*Id.* at 072; Trust ¶ 2.1(c))  "The Trustee, at the direction of the Committee . . . may make any

distribution required to be made by it hereunder by [options for making payments omitted]"

(*Id*. at 076; Trust ¶ 3.6(b))  The Trust requires making distributions in the event of taxation:

"if at any time the Trust is finally determined by the IRS not to be a "grantor trust" with the

result that the income of the Trust Fund is not treated as income of the Company . . . or if a tax is finally determined by the IRS to be payable by one or more Participants or Beneficiaries with respect to any interest in the Plans or the Trust Fund prior to payment of such interest to such Participant or Beneficiary, then the Trust shall immediately terminate, the Trustee shall immediately determine each Participant's share of the Trust Fund . . . and the Trustee shall immediately distribute such share in a lump sum to each Participant or Beneficiary. . . ." (*Id*. at 077; Trust ¶ 3.6(e))  And the Committee could have bypassed the Trust and made distributions directly to the participants.  (*Id*. at 077; Trust ¶ 3.6(d))  IT Corporation and the Trustee had authority to execute amendments to the Trust jointly.  (*Id*. at 081; Trust ¶ 9.1(c))  Finally, the Trust prohibits distributions when IT Corporation actually *is* insolvent.  (*Id*. at −77-79; ¶ 3.7(a), (b))

22.    The second amended complaint alleges that in late 1995 Robert Sheh, the President/CEO of International Technology Corp. ("ITC") (which changed its name to the IT Group in December 1998 (Ex. "5" at 109; ¶ 3)), orally promised to Dr. James Mahoney, senior vice president, and to other prospective participants that ITC would fund the Trust and make distributions for the sole benefit of the participants if it ever appeared that the company was at risk of insolvency.  (*Id*. at 113-15; ¶¶ 27-38)  Attached is Dr. Mahoney's declaration in support of the same.  (Ex. "22" at 315)

## ARGUMENT

### A.  A Stay of Enforcement of the Bankruptcy Court's Dismissals Is Appropriate.

**1.  Claimants Are Likely to Succeed on Appeal and At Minimum Have Raised Substantial Issues on Appeal.**

To obtain a stay under Bankruptcy Rule 8005[6] a party must generally establish that the appellant is likely to succeed on the merits of the appeal; that the appellant will suffer irreparable injury; that no substantial harm will come to the appellee; and that the stay will do no harm to the public interest. *In re VF Brands, Inc. v. The Money's Trust*, 282 B.R. 134, 137 (D. Del. 2002); *In re Wymer*, 5 B.R. 802, 806 (Bankr. 9th Cir. 1980). Where a trial court is being asked to stay its own order, the likelihood-of-success-on-the-merits element is weighed less heavily and the appellants must show only a "substantial case" or "fair chance" of success, particularly where there is no harm to the appellees. In order to show a substantial case, the movant must establish that significant legal issues are presented, e.g., in undecided areas of law or difficult application of the law to the facts.[7]

        a. Here, the Claimants are likely to succeed on the merits, and have at minimum raised novel substantial issues on appeal. The issue on appeal is whether there is an obligation to fund an exclusive benefit trust found in the provisions of the DCP and the purported rabbi trust, which makes the DCP funded under § 1081(a)(3). The Movants first note that the Trustee has admitted in its opposition brief filed with the Third Circuit that the Standard of Review applied by both of the lower courts was erroneous, increasing the chances of reversal.[8] They next note that in DCP ¶ 12.1, IT Corporation transferred

---

[6] Rule 8005 is adapted from Fed. R. App. Proc. 8(a). *In re Highway Truck Drivers & Helpers Local Union # 107*, 888 F.2d 293, 297 (3d Cir. 1989)

[7] *In re Polaroid Corp,* 2004 U.S. Dist. Lexis 1917 (D. Del. 2004) (Farnan, J.) ("*Polaroid*") ("substantial case" required); *In re Westwood Plaza Apartments Ltd.*, 150 B.R. 163 (Bankr. E.D. Tex. 1993) (substantial case on appeal because of important legal questions, including the standards for determining interest, rates and cramdown, which had not been addressed by the circuit); *In re Gleasman*, 111 B.R. 595, 601 (Bankr. W.D. Tex. 1990) (substantial issue found where issue of law was untested at circuit level).

[8] The Bankruptcy Court's Opinion entered findings of fact and conclusions of law under Fed. R. Bankr. P. 7052; the District Court applied a clearly erroneous standard to lower court

discretion over "funding" to an administrative committee.  Under the lowest standard

possible under federal law for *bona fide* top-hat plans (*Goldstein v. Johnson & Johnson,* 251

F.3d 433 (3d Cir. 2001), this funding discretion would be subject to a "good faith" standard

that prohibits forfeitures—as to funding.  As the only beneficiaries of the DCP and hence the

funding discretion are the participants and their designees under Article VII, and as the CFO

of the IT Group was always a Committee member, funding discretion had to be exercised on

behalf of the participants at some point before the IT Group's insolvency, without

considering the interests of the IT Group or its key vendors and suppliers.  Under the Trust

the funding could have occurred for the exclusive benefit of the participants by making

distributions directly to the participants, bypassing the Trust, as permitted by the Trust.  (Ex.

"2" at 077; Trust ¶ 3.6(d))  IT Corporation and the Trustee also pre-approved amending the

Trust to be an exclusive benefit trust in Trust ¶ 9.1(b)(i), using standard exclusive benefit

language.  *Outzen v. FDIC*, 948 F.2d 1184, 1185-87 (10th Cir. 1991) ("[u]nder no

circumstances shall any funds contributed under the Plan . . . *be used for, or diverted for*

*purposes other than for the exclusive benefit of such Participants*"); *Wright v. Nimmons*, 641

F. Supp. 1391 (S.D.Tex. 1986).  *In re C.D. Moyer Co. Trust Fund*, 441 F. Supp. 1128, 1131-

33 (E.D. Penn. 1977).  Even if ¶ 9.1(b)(i) were ambiguous, which it is not, the Movants have

submitted herewith the declaration of one of the participants,[9] Dr. James Mahoney, stating

_____

findings, and a plenary standard to its legal conclusions.  The Trustee admitted however in its
opposition brief that the usual standard under Fed. R. Civ. Proc. 12(b)(6) applied: where all
well plead allegations in the complaint are accepted as true; all reasonable inferences are
resolved in the light most favorable to the plaintiff; and documents attached to the complaint
may be considered.  (Ex. "17" at 261)

[9] On September 6, 2005, the Bankruptcy Court erred refusing to consider this declaration and
the offer of live testimony for the purpose of determining if there was a substantial case on
appeal.  (Ex. "18" at 276-77)  The Court said the Movants should have offered this
declaration "in the underlying motion."  (*Id.* at 280, lines 6-8)  But at the hearing in February

that Robert Sheh, the President & CEO promised him before the DCP was enacted in January 1996 that the company would fund the trust for the sole benefit of the participants and make distributions to them if it ever appeared the IT Group was on the verge of insolvency.  As the participants have rights under the plan and trust are greater than those of unsecured creditors, the test for "funding" is satisfied.  The DCP is subject to *inter alia* Part III of ERISA (minimum funding requirements).  No reported decision of any federal court has addressed the novel questions in this case, which favors finding success on the merits in the District of Delaware.  In *Polaroid, supra* fn. 7, this court cited as persuasive authority, *In re Columbia Gas System, Inc.*, 1992 U.S. Dist. Lexis 3253 (D. Del. 1992) ("*Columbia Gas*"), where Judge Robinson granted an a motion for stay and held regarding novel legal issues:

---

2003 on the renewed consolidated motions to dismiss under FRCP 12(b)(6), the *Accardi Appellants* had no reason to offer it: they alleged it in their complaint, and the lower court was required to assume the allegation was true under the usual standard for 12(b)(6) motions, as the Trustee has admitted to the Third Circuit.  (Ex. "17" at 261)

        The Court also stated that the record was closed as declaration addressed the "underlying question" on appeal.  (*Id.* at 278, lines 4-6)  The key issue on appeal is whether the Bankruptcy Court erred in its legal conclusion that the DCP is "unambiguously unfunded."  The Movants did not appeal and do not take issue with the Bankruptcy Court's additional ruling: that extrinsic evidence, such as Dr. Mahoney's declaration, would be admissible if the DCP were ambiguous (Ex. "8" at 175, citing *In re New Valley*, 89 F.3d 143, 150 (3d Cir. 1995)).  Thus the Third Circuit is only reviewing whether the DCP is ambiguous; it is not reviewing Dr. Mahoney's actual testimony.

        The appeals courts can consider evidence outside of the record on appeal: In Part VIII of the Bankruptcy Rules, the district courts may consider evidence in connection with motions for stay pending appeal.  Fed. R. Bankr. Proc. 8011(a) ("If a motion is supported by ... *affidavits* ..., they shall be filed or served with the motion."); *cf.* Fed. R. App. Proc. 8(a)(2)(B)(ii), (iii).  The District Court can consider Dr. Mahoney's testimony to determine if there is a novel, "substantial case" on appeal (as was done in *Columbia Gas, infra,* for determining if a stay should be granted), without contradicting its prior Opinion and without making findings that would conflict with any ruling from the Third Circuit.

        Dr. Mahoney's recitation of statements made to him by the President/CEO is not inadmissible as hearsay at this stage of the proceedings.  *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 1988) (hearsay based on direct observations of witness admissible at hearing on motion for preliminary injunction).  See *In re Roth American, Inc.*, 90 B.R. 94 (M.D. Pa. 1988) (standards governing preliminary injunctions same standard as used for motion for stay pending appeal).

> "*This Court <u>does not intend to go so far as to</u> <u>actually determine the merits of</u>
> <u>the legal issues which will be presented on appeal</u>.*  Suffice it to say, however,
> that *we have not found, nor been cited to, any controlling authority on this
> precise question*, *and the novel legal issue presented is not one in which the
> debtor has no likelihood of success. This case will likely present an issue of
> first impression and, on balance, the likelihood of success on the merits does
> not appear to weigh too heavily in favor of, or against, any of the parties to
> this proceeding.*"

(Ex. "26" at 333; *Columbia Gas*, 1992 U.S. Dist. Lexis 3253 at * 4-5)

b.   If the *Accardi Appellants* succeed on appeal and Part III of ERISA is

ultimately found to apply, the *Accardi Appellants* will satisfy the elements of § 1082

necessary for judicial recognition that an unperfected lien arose pre-Petition Date that is

entitled to priority status in bankruptcy (undisputed by the IT Trustee in the lower court).

First the DCP is a "pension benefit plan" under § 1082(a)(1) as it provides for "retirement

income" and the deferral of income to the termination of employment and beyond.  (Ex. "1"

at 056; DCP ¶¶ 5.1, 5.2 ("systematic deferment options"—taking a lump sum or taking equal

monthly payments over 5 years, 10 years, or 15 years).  *Murphy v. Inexco Oil Co.*, 611 F.2d

570, 575 (5th Cir. 1980).  Second, the "employer" is responsible for required installments

under § 1082(c)(11), so IT Corporation will be liable.  As all 68 separate bankruptcy estates

have been substantively consolidated pursuant to the Joint Plan, the entire IT Trust is liable.

Third, under § 1082(f)(1) "there shall be a lien" when any person fails to make a required

installment due under § 1082 and the "balance" of all such installments exceed $1 million

(subsection (f)(1) deals with whether a lien exists or not).  Subsection (f)(3) states that the

"amount" of the lien is equal to the aggregate amount of unpaid installments without regard

to the $1 million threshold of subsection (f)(1).  Ordinarily the amount of contributions

necessary to fund unpaid benefits is the subject of expert testimony.  *Carabba v. Randall*

*Food Mkts, Inc.*, 145 F. Supp. 2d 763 (N.D. Tex. 2000).  The Movants have not retained an

16

actuary as no discovery has ever commenced due to the dismissals with prejudice.  But the "amount" under (f)(3) does not have to be quantified now to know that a large liability under (c)(11) is certain, and that the liens arose under (f)(3) during 1996-2001.  The "aggregate unpaid balance of all preceding such installments" under subsection (f)(1) accrued between 1996 and the Petition Date and easily exceeded the $1 million threshold several years before the Petition Date.  (Soose Dec., Ex. "12" at 28)  The Bankruptcy Court agreed, using the total amount of unpaid benefits to fix the "Schedule C-1 Reserve" to cover any allowed priority claims for unfunded contributions.  Fourth, the liens arose pre-petition and were not barred from attaching by the automatic stay of 11 U.S.C. § 362(a).  § 1082(f)(4)(B).  Fifth, all liens imposed will be entitled to priority treatment.  On December 22, 1987, Congress amended ERISA by enacting the Pension Protection Act of 1987[10] ("PPA"), including § 9304(f)(4)(C) which provides:

> "[a]ny amount with respect to which a lien is imposed under paragraph (1) [of subsection 1082(f)] *shall be treated as taxes due and owing the United States and rules similar to the rules of subsections (c), (d), and (e) of section 4068 [29 U.S.C. § 1368] of this title shall apply with respect to a lien imposed by subsection (a) of this section.* . ."

(See Ex. "24" at 329; codified at 29 USC § 1082(f)(4)(C) (1987))  The Conference Report (Ex. "23" at 319), which notes conference agreement to the Finance Committee Amendment (Ex. "23" at 325), states in the Finance-Committee section on "security rules for underfunded plans":

> "*Rules similar to the rules in section 4068(c) . . . of ERISA apply with respect to the lien and the amount on which it is based.  As under section 4068(c) a perfected lien is treated as a Federal tax lien and an <u>unperfected</u> ERISA lien is treated as a Federal tax claim.*"

---

[10] Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, §§ 9301-9346, 101 Stat. 1330, 1330-331-1330-374 (Dec. 22, 1987).

(Ex. "23" at 323-24)  Congress also made § 1082(f)(4)(C) apply to bankruptcy cases.[11]  Thus

the full substantive effect of § 1082(f)(4)(C) is that unperfected ERISA liens shall be treated

the *same as* "*taxes due and owing the United States*" under the Bankruptcy Code.  Both the

Bankruptcy Act of 1898 and the Bankruptcy Code in 1978[12] grant priority treatment to

<u>un</u>secured tax claims of the United States.[13]  Lastly, the DCP is a "defined benefit" plan

under § 1082(e)(1) and (f)(2).  A defined benefit plan is any plan that is not a defined

contribution plan.  § 1002(35)  The main feature of a defined contribution plan is that there is

an individual account created for each participant.[14]  But under the DCP there can <u>never</u> be

---

[11] Section 1082(f)(4)(C) states that the "rules" of subsection 1368(c) "shall apply" to the "lien imposed" by subsection (f)(1)(A).  Subsection (2) of section 1368(c) is a similarly-worded statute in favor of the PBGC.  One of the "rules" in section 1368(c)(2) is that subsection (c)(2) applies for purposes of the Bankruptcy Code ("for purposes of title 11").

[12] When ERISA was enacted, taxes "due and owing" the United States had been granted a priority under the Act.  App. A <u>Collier on Bankruptcy</u> (15th ed.) App. Pt. 3-61 (Rel. 60-12/96) (11 USC § 104a.(4) (1898)) (Act of July 1, 1898, ch. 541, 64(a), 80 Stat. 271, 307).  "This provision was modified . . . in 1938, when it was moved to § 64(a)(4) ([a] fourth priority) and amended to apply to 'taxes legally due and owing by the bankrupt to the United States . . .' 52 Stat. 874."  *United States v. Reorganized CF&I*, 518 U.S. 213, 220 n.4 (1996).  When the Bankruptcy Code was enacted in 1978, taxes of "governmental units" had a 6th priority.  11 U.S.C. § 507(a)(6) (1979)

[13] Under 11 U.S.C. § 507(a)(8)(a)-(g) (1979), most (five of seven) of the categories listed of unsecured priority claims are for "taxes."  A "governmental unit" includes the "United States."  11 USC § 101(27)  And the concept of taxes "due and owing" in § 1082(f)(4)(C) simply describes an unpaid tax debt on which there is liability.  This is identical to holding an "allowed tax claim" under 11 U.S.C. § 507(a)(8), which describes holding an allowed tax debt (undisputed or allowed by the bankruptcy court) where there has not yet been a distribution.  *PBGC v. Quimet Corp.*, 470 F. Supp. 945, 953 n.19 (D. Mass 1979) (interpreting then-section 507(a)(6): "the recent revision of the Bankruptcy Act [in 1978] . . . gives priority to a [federal] tax claim").  See the definitions of "claim" and "debt" in 11 USC § 101(5), (12), and "due and owing."

[14] *PBGC v. Defoe Shipbldg. Co.*, 639 F2d 311, 313 (6th Cir. 1981) (benefits based "solely upon the amount contributed to the account")  *Connolly v. PBGC*, 581 F.2d 729, 733 (9th Cir. 1978) ("*Connolly*"); *PBGC v. Gray Grimes Tool Co., Inc.*, 546 F. Supp. 102, 107 (E.D. Mich. 1982) ("*Gray Grimes*").

individual accounts for individual participants ("contributions received . . . shall be held . . . as a <u>single fund</u> without distinction between income and principal . . .")  (Trust ¶ 2.4; Ex. 2 at 072)  For defined contribution plans a participant's interest in their account and benefit at retirement is determined by the contributions actually made and subsequent investment performance; the accrued benefit is the balance in the account.[15]  Such participants "bear the risk of their investments.'"  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-41 (1999) ("*Hughes Aircraft*").  Thus, such plans are exempt from the funding requirements of Part III of ERISA as they can never be underfunded.[16]  Here the DCP defines the benefit without regarding to investment performance—interest accrues on each participants' account balance at a fixed interest rate.  The courts also ask if the defined-contribution participant has right, title and interest in the account[17] or contractual protections preventing the diversion of employee contributions.[18]  None of these provisions are found here.  (See Ex. "2" at 076; Trust ¶ 3.6(a) ("right, title or interest" . . . "not vest[ed] in any participant.")

---

[15] "Upon retirement, the employee is entitled to the funds in his account."  *Commission of IRS v. Keystone*, 508 U.S. 152, 153 (1993).  *Hunt v. Hawthorne Assoc., Inc.*, 119 F.3d 888, 892 (11th Cir. 1997); *Lyons v. Georgia Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1251 n.29 (11th Cir. 2000); *Brillinger v. GE*, 130 F.3d 61, 62 (2d Cir. 1997) (benefits based on "contributions, subject to gains or losses"); *Connolly*, 581 F.2d at 733 (no benefit "beyond the balance of [the] . . . account. . ."); *Gray Grimes*, 546 F. Supp. at 107.

[16] See § 1081(a)(8); *Hughes Aircraft*, 525 U.S. at 440 n.3 ("*there can never be an insufficiency of funds in the plan to cover promised benefits*")

[17] *Connolly*, 581 F.2d at 733 ("*no right, title, or interest in these amounts.  Under the structure of the Plan, no purpose is served in providing an individual account for each participant*")

[18] *ATO, Inc. v. PBGC*, 456 F. Supp. 545 (N.D. Oh. 1978), *rev'd on other grounds*, 634 F.2d 1013, 1018 n.9 (6th Cir. 1980) (plan not "contractually structured to assure that the contributions made on behalf of an employee reach that employee").

**2. Claimants' Priority Claims, However Meritorious, Will Be Irrevocably Prejudiced/Mooted If the Schedule C-1 Reserve Is Released and Distributed.**

If a stay is denied and the Schedule C-1 Reserve is released, the IT Trustee may distribute the "Schedule C-1 Reserve" to *thousands of creditors*, which could occur before the Third Circuit rules.  If a distribution occurs the IT Trust will have no practical way to recover the distributions, even if the DCP's priority claims are deemed meritorious.  The IT Trustee will have obtained an effective judgment.  There is no mechanism in the Joint Plan to recover the funds; nor is any court going to have an order served on thousands of creditors to refund a *pro-rata* portion of their already-miniscule 1% distribution.  Under the doctrine of equitable mootness when an unstayed bankruptcy plan is substantially consummated such that no assets remain out of which to satisfy a creditor's claim, the appeal becomes moot as to the bankruptcy estate and the claim, *however meritorious*, is lost as to the estate.  *In re Chateguay Corp.*, 988 F.2d 322, 326 (2d Cir. 1993) (implementation of unstayed bankruptcy distribution order mooted appeal); *In re Revere Copper & Brass, Inc.*, 78 Bankr. 17, 20 (S.D.N.Y. 1987) (same).  In a case on point, the district court granted a stay to prevent such harm under Fed. R. Bankr. P. 8005, in *Lutin v. United States Bankruptcy Court*, 173 B.R. 467, 468-49 (Dist. Ct. S.D.N.Y. 1994):

> "If a stay pending appeal is denied, the debtors' assets will be distributed without any reserve for the Affiliates' claim.  That is the consequence of the Bankruptcy Court's *subsequent order . . . **which granted the Objectors' application to make a distribution to creditors without maintaining a reserve**. . . .*  The inevitable result, which the Objectors cannot reasonably question, is that **a *denial of a stay would <u>moot the appeal</u> and deny . . . any recovery.  <u>That is a quintessential form of prejudice</u>**…"

*Id.* (emph. add.)  Because of the risk of irrevocable prejudice to the Priority Claims, the *status quo* must be kept during the pendency of the appeal to the Third Circuit.

Contrary to the Bankruptcy Court's finding that "the risk . . . of non-recovery is slight" given the Re-Reserve Order, said order still makes the Priority Claims of the Movants subject to several substantial risks. First there is no guarantee that the remaining 100 preference actions and the D&O action will result in recoveries of at least $3.1+ million. The last of these lawsuits can be expected to be the most hard-fought. But even if sufficient funds are recovered, they may be diverted: "Litigation Recoveries" are subject to surcharge by the estate's professionals. (Ex. "9" at 188; ¶ 7.22) Second, there is a timing issue: the IT Trustee had been settling these actions at a rapid pace, raising the prospect that the funds may be collected and distributed before the Third Circuit appeal is resolved. (The IT Trustee filed over 1,200 preference actions in January 2004, with about 100 now remaining). Accordingly, the Re-Reserve Order does not provide the guarantee of a *bona-fide* reserve. The *Accardi Appellants* claims are at substantial risk of irreparable harm, when the status quo for a year and 3 months had been a guaranteed reserve.

**3. The Terms of the Joint Plan, And the Actions of the IT Trustee Show No Substantial Harm Will Come to Any Appellee or Creditor.**

The IT Trustee's actions show no significant prejudice arises from a delay in making a distribution using the Schedule C-1 Reserve while the appeal is pending. While the Bankruptcy Court noted the Joint Plan confirmed in April 2004 "does not require a reserve be established for disputed claims" (Ex. "18" at 273), it is reasonable to require one if there is a substantial case that the disallowed claim will be allowed: allowed priority claims are required to be paid in full. (Ex. "9" at 186, 187; ¶¶ 1.1(i), 5.2) And several months later, at the hearing on the Reserve Motion in July 2004, no party argued to the bankruptcy court that no amount should be reserved for the Priority Claims—even though the Movants had already lost before the Bankruptcy Court (the adversary proceedings had been dismissed with

prejudice), and appeals were pending.  To the contrary, the IT Trustee volunteered in its

Reserve Motion to hold $2,037,626 in reserve for the *Accardi Claimants*, when they had not

even contacted the IT Trustee to request one.  (The amount was insufficient, well short of the

$3.1 million that the IT Trustee "agreed" to after the Bankruptcy Court threatened to not

allow any distribution, but substantial enough to show there was no harm in reserving funds).

And nowhere in the Reserve Motion did the IT Trustee place a time limit on holding the

reserve to just one appeal.  The IT Trustee admits that, in effect, the Trustee volunteered a

stay pending appeal in July 2004: in the Motion to Modify Reserve heard September 6, 2005,

the IT Trustee admitted: "the Reserve Order effectively grants the Accardi Claimants a stay

pending their appeal. . . ."  (Ex. "16" at 255)  At that hearing, the Bankruptcy Court said the

IT Trustee may have volunteered a reserve in July 2004 because it was not ready then to

make a distribution.  But the IT Trustee could not have known when it would be ready, yet

after winning it voluntarily reserved subject to the appeals process.  The IT Trustee knows

now it will have difficulties in making the distribution authorized on September 6, 2005 (the

$5,176,227 in "Available Funds" which did not include the Schedule C-1 Reserve).  In the

Distribution Motion the IT Trustee refused to provide any assurances as to when this

distribution would be made: "the Trustee can make no assurance that the Initial Distribution

can be effected in late October 2005 as intended."  (Ex. "19" at 298)  Given the miniscule

size of the distribution authorized September 6, 2005 (far less than 1%), the even smaller size

of the Schedule C-1 Reserve relative to the billions in claims, the time the reserve has been in

place, there is minimal injury to creditors if the Schedule C-1 Reserve is held for several

more months.  And maintaining the reserve in an interest bearing account offsets any

prejudice to the IT Trust.  *Lutin*, 173 B.R. at 469.

Granting a stay will not unreasonably delay the right to a final decision on the disbursement of the Schedule C-1 Reserve**.**  Any delay arising out of a stay against distributing a small fraction of an *already-miniscule* 1% distribution is irrelevant to each individual creditor.  The IT Trustee has not sought expedited review of any proceeding before any of the courts over the last year and 7 months.[19]  Granting a stay should not delay final consummation of the Joint Plan as over 100 preference actions and the D&O lawsuit are still pending (seeking $70 million in total recoveries).  *Lutin*, 173 B.R. at 469 ("other matters, unrelated to . . . the appeal, are delaying consummation")  Finally, the briefing before the Court of Appeals is complete/under submission.  The Third Circuit is expending its resources and a decision can be expected soon.  It makes no sense to change the status quo and pull the rug out from under the Third Circuit, permitting the IT Trustee to equitably moot the Priority Claims vis-a-vis the IT Trust.

### 4.  The Stay Will Not Harm the Public Interest.

The Bankruptcy Court found that the public interest did not weigh in either party's favor in analyzing whether a stay should be granted.[20]  But if the DCP is funded and subject to Parts III and IV of ERISA, then the public interest is in ensuring that the obligation to fund the DCP conforms to § 1082, with the 100%-vested-benefits of the DCP (Ex. "1" at 054, ¶ 3.8) paid in full.  See § 1001(a); *Nachman Corp. v. PBGC*, 446 U.S. 359, 374-75 (1980).

---

[19] For example, the consolidated motions to dismiss before the Bankruptcy Court, where the court took 8 months to dispose of the motions; the *first* distribution and reserve motion; the appeal before the District Court, which took 11 months to issue its opinion; the appeal before the Third Circuit.  Even when the Trustee had a potential interim distribution of the Schedule C-1 Reserve within its grasp, after the hearing at the Bankruptcy Court on May 10, 2005, it waited over two months before following-up regarding the undersigned's drafting of a form of order.

[20] The public interest does not weigh in favor of the Appellees as there are no jobs to be saved: the Debtors' bankruptcy cases are liquidations with all assets sold and zero employees left out of 6,790.

## REQUEST FOR RELIEF

For the forgoing reasons, *Accardi Appellants* respectfully request that the District

Court grant the Motion and execute the accompanying orders, per the Relief-Requested

sections on pages 3 and 5.  If necessary to implement the foregoing relief, the *Accardi*

*Appellants* also request that the *Accardi Appeal* be reopened; and that the District Court order

such further and additional relief as may be appropriate under the circumstances.

Dated: Santa Barbara, California
   October 10, 2005       */s/ Thomas A. Johnson* .
                Thomas A. Johnson (Cal. Bar 158270)
                Law Offices of Thomas A. Johnson
                33 West Mission St., Suite 201
                Santa Barbara, CA 93101
                (805) 682-2600

                */s/ John Stull* .
                John M. Stull
                1300 N. Market Street
                Wilmington, DE 19899-1947
                (302) 654-0399

                Attorneys for *Accardi Appellants*

## Statement Regarding Compliance with D. Del. L.R. 7.1.1.

The undersigned contacted counsel for the IT Trustee, Ileana Cruz, by e-mail on April 21, 2005, requesting that the IT Trustee agree to a stay of enforcement of the Bankruptcy Court's judgment of dismissal.  As of the date the motion for stay was filed with the Bankruptcy Court, no response, positive or negative, had been received.  Subsequently, the IT Trustee opposed the motion for stay before the Bankruptcy Court on September 6, 2005, and moved for release of the Schedule C-1 Reserve at said hearing.

Dated: Santa Barbara, California
        October 10, 2005

                                    */s/ Thomas A. Johnson            .*
                                    Thomas A. Johnson (Cal. Bar 158270)
                                    Law Offices of Thomas A. Johnson
                                    33 West Mission St., Suite 201
                                    Santa Barbara, CA 93101
                                    (805) 682-2600