EXHIBIT "3"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                       :        Chapter 11

THE IT GROUP, INC.,                          :        Case No. 02-10118 (MFW)
     et al.,
                                             :        Jointly Administered
                    Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE JOINT CHAPTER 11 PLAN FOR THE IT GROUP, INC. AND ITS AFFILIATED DEBTORS PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Dated: December __, 2003

SKADDEN, ARPS, SLATE
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636
(302) 651-3000

ATTORNEYS FOR THE DEBTORS

WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700

THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
(302) 655-5000

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

086

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................2

NOTICE TO HOLDERS OF CLAIMS .................................................................................2

I. EXPLANATION OF CHAPTER 11....................................................................4
    A. Overview of Chapter 11.........................................................................4
    B. Chapter 11 Plan......................................................................................4

II. OVERVIEW OF THE PLAN................................................................................6
    A. Means for Implementing the Plan..........................................................6
    B. Summary of Classification and Treatment Under the Plan. .................15

III. HISTORY OF THE DEBTORS AND COMMENCEMENT OF THE CHAPTER 11 CASES................................................................................19
    A. Description of the Company's Business Operations. ...........................19
    B. Events Preceding the Commencement of the Chapter 11 Cases. ........22

IV. THE CHAPTER 11 CASES...............................................................................23
    A. Commencement of the Chapter 11 Cases. ..........................................23
    B. Continuation of Business After the Petition Date................................23
    C. Formation and Representation of the Official Unsecured Creditors' Committee..........................................................................................29
    D. Appointment of an Examiner................................................................29
    E. The Shaw Transaction...........................................................................31
    F. Case Administration..............................................................................33
    G. Significant Claims and Litigation. ........................................................34

V. SUMMARY OF THE PLAN ..............................................................................40
    A. Classification and Treatment of Claims and Equity Interests...............40
    B. Alternative Dispute Resolution.............................................................45
    C. Conditions Precedent to Confirmation..................................................47
    D. Conditions Precedent to the Occurrence of the Effective Date. ...............48
    E. Assumption of Executory Contracts and Unexpired Leases..................48
    F. Rejection of Executory Contracts and Unexpired Leases......................49
    G. Claims Arising from Rejection or Termination. ...................................49
    H. Fractional Distributions. .......................................................................49
    I. Provisions for Treatment of Contested Claims. ...................................49
    J. Discharge of the Debtors. .....................................................................50
    K. Modification of the Plan. ......................................................................50
    L. Revocation of the Plan..........................................................................51
    M. Causes of Action...................................................................................51
    N. Third Party Agreements; Subordination. ..............................................51
    O. Dissolution of Committee.....................................................................51
    P. Exculpation. ..........................................................................................51
    Q. Injunctions.............................................................................................52
    R. Supplemental Documents. ....................................................................52
    S. Retention of Jurisdiction.......................................................................53

VI. CONFIRMATION AND CONSUMMATION PROCEDURE...........................54

MIAMI 413827 v10 (2K)

A.    Solicitation of Votes. ...............................................................54
B.    The Confirmation Hearing. ........................................................55
C.    Confirmation. ...........................................................................55
D.    Consummation. ........................................................................57
VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN..........................58
A.    Consequences to the Debtors. ....................................................58
B.    Consequences to Holders of Certain Claims or Equity Interests. ..............60
VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..............61
A.    Liquidation under Chapter 7. ......................................................61
B.    Alternative Plan of Reorganization. ..............................................61
IX.    CONCLUSION AND RECOMMENDATION ..............................................62

such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interests in such class. **The Plan Proponents believe that the Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests, and can therefore be confirmed despite a rejection by holders of Non-Lender Secured Claims in Class 2, Unsecured Claims in Class 4A, Litigation Unsecured Claims in Class 4B, Securities Litigation Claims in 4C, Subordinated Claims in 4D or Equity Interests in Class 5.**

## II.    OVERVIEW OF THE PLAN

### A.    Means for Implementing the Plan.

The central component of the Plan is the compromise and settlement of any and all claims and causes of action as of the Effective Date by and among the Prepetition Lenders and the Agent, on the one hand, and the Debtors, the Subsidiaries that are not Debtors and the Committee (and all of its members), on the other hand (the "Plan Settlement"), subject to the occurrence of the Effective Date. Additionally, the Plan contemplates the liquidation of all remaining Assets of the Debtors for the benefit of holders of allowed Claims against the Debtors in accordance with the Plan including, without limitation, the prosecution of Avoidance Actions and Estate Causes of Action.

The Plan is the product of extensive arms' length negotiations between the Plan Proponents and the Agent (on behalf of the Prepetition Lenders) to maximize recoveries to the Debtors' creditors and provides for a fair allocation of the Debtors' remaining Assets as a consequence of the Shaw Transaction. The Plan effectuates this goal by substantively consolidating the numerous Debtor entities and implementing the Plan Settlement, which embodies the global settlement negotiated by and among the Committee, the Debtors and the Agent (on behalf of Prepetition Lenders). The Plan provides for full payment of all Administrative Claims and Priority Claims in accordance with the provisions of the Bankruptcy Code, as well as for the cancellation of all of the existing Equity Interests in, and the discharge of all Claims against, the Debtors.

### 1.    Substantive Consolidation.

On or as of the Effective Date, all assets and liabilities of the Debtors shall be substantively consolidated for voting and distribution purposes under the Plan. Accordingly, (i) all intercompany claims by and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Debtors other than IT Group shall be merged or treated as though they were merged into and with the assets and liabilities of IT Group, (iii) all guarantees of the Debtors of the obligations of any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors, (iv) all Equity Interests owned by any of the Debtors in any other Debtor shall be treated as though they were extinguished, and (v) each and every Claim filed or to be filed in these Chapter 11 Cases against any of the Debtors shall be deemed filed against the consolidated Debtors, and shall be deemed one Claim against the consolidated Debtors. Moreover, all claims based upon guarantees of collection, payment or performance of any obligation of the Debtors made by any Subsidiary which is not a Debtor and all claims against any such Subsidiary for which any of the Debtors are jointly and severally liable, in each case which arise prior to the Effective Date, shall be discharged, released, extinguished and of no further force and effect.

a.    General Description

Generally, substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes under a plan. The effect of consolidation is the pooling of the assets of, and claims against, the consolidated debtors; satisfying liabilities from a common fund; and combining the creditors of the debtors for purposes of voting on chapter 11 plans. There is no

089

statutory authority specifically authorizing substantive consolidation. The authority of a bankruptcy court to order substantive consolidation is derived from its general equitable powers under Bankruptcy Code section 105(a), which provides that the court may issue orders necessary to carry out the provisions of the Bankruptcy Code. Nor are there statutorily prescribed standards for substantive consolidation. Instead, judicially developed standards control whether substantive consolidation should be granted in any given case.

b.    Legal Standards for Substantive Consolidation

The propriety of substantive consolidation must be evaluated on a case by case basis. In deciding whether to consolidate, in the past courts relied on the presence or absence of certain "elements" that are similar to factors relevant to piercing the corporate veil under applicable state law. More recent cases, however, while not ignoring these elements, have applied a less mechanical approach. Thus, the extensive list of elements and factors frequently cited and relied upon by some courts in determining the propriety of substantive consolidation are variations of two critical factors, namely (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, or (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. Under the so called Eastgroup test, which is an equitable test, a proponent of substantive consolidation must show that (1) there is substantial identity between the entities sought to be consolidated and (2) that consolidation is necessary to avoid some harm or realize some benefit. Once the proponent of substantive consolidation makes this showing, a presumption arises that creditors have not relied solely on the credit of one of the entities involved, and the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated and (2) it will be prejudiced by substantive consolidation.

Regardless of which of the two similar but not identical tests are utilized for determining the propriety of substantive consolidation, the "elements" enumerated in earlier cases remain relevant, but not necessarily dispositive, as to whether substantive consolidation should be granted. These elements include:

(i)    the degree of difficulty in segregating and ascertaining the individual assets and liabilities of the entities to be consolidated;

(ii)    the presence or absence of consolidated financial statements among the entities to be consolidated;

(iii)    the commingling of assets and business functions among the entities to be consolidated;

(iv)    the unity of interests and ownership among the various entities;

(v)    the existence of parent and intercorporate guarantees on loans to the various entities; and

(vi)    the transfer of assets to and from the various entities without formal observance of corporate formalities.

c.    Substantive Consolidation is Warranted

The Plan recognizes that substantive consolidation in some form is warranted in light of the criteria established by the courts in ruling on the propriety of substantive consolidation in other cases. The Plan Proponents believe that the Plan's proposed substantive consolidation is fair and equitable and appropriate under the circumstances because, among other things:

(i)    The operations, business functions and financial records of the Debtors were substantially commingled, such that the assets and liabilities of the Debtors' Estates are intertwined;

090

(ii)     A separate winding down of the Debtors' Estates would entail the segregation of the commingled assets and liabilities. The exercise of disentangling the prior transactions of the individual Debtor entities, even if it could be accomplished, would be an unproductive and inequitable task that would be harmful to creditors due to the prohibitive costs and resultant delays associated with such a task;

(iii)     Substantive consolidation will maximize the overall return to holders of Allowed Claims because it will avoid and eliminate the significant administrative costs and expenses that otherwise would be associated with the difficult and potentially infeasible task of liquidating each of the Debtors' Estates separately.

Accordingly, on or as of the Effective Date, any or all of the Debtors (other than IT Group) and Subsidiaries of the Debtors may, at the sole option of the Plan Proponents, be (a) merged into one or more of the Debtors or (b) dissolved. Upon the occurrence of any such merger, all assets of the merged entities shall be transferred to and become the assets of the surviving entity, and all liabilities of the merged entities, except to the extent discharged, released or extinguished pursuant to the Plan and the Confirmation Order, shall be assumed by and shall become the liabilities of the surviving entity. All mergers and dissolutions shall be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors.

## 2.     **Plan Settlement.**

The Plan provides for a global compromise and settlement, pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, of all Causes of Action as of the Effective Date by and between the Agent and the Prepetition Lenders, on the one hand, and the Debtors, the Subsidiaries that are not Debtors, and the Committee (and all of its members), on the other hand. The Plan Settlement provides that, upon the occurrence of the Effective Date, (a) the Lender Claims shall be deemed Allowed in full as provided in Section 4.1(c) of the Plan, (b) the Committee Lawsuit shall be dismissed with prejudice, (c) any and all Claims and Causes of Action of the Debtors (and their Estates), the Subsidiaries that are not Debtors, and the Committee (and all of its members) against the Agent and the Prepetition Lenders as of the Effective Date shall be forever waived, discharged, released and enjoined, (d) the holders of Allowed Lender Claims shall receive the treatment accorded such Claims under the Plan in complete satisfaction of any and all rights, claims and Causes of Action that comprise or arise under the Lender Claims, including without limitation, any subordination or other provisions in respect of the Old Notes, the holders thereof or the Indenture Trustee, and (e) any right to a Distribution on account of any deficiency Claim, Unsecured Claim or Administrative Claim (other than any claims for the reimbursement of all fees and expenses of the Agent which shall remain in effect which shall be treated and paid as an Administrative Claim in accordance with the Plan) by the holders of the Lender Claims shall be forever waived, discharged, released and enjoined, which Claims shall be deemed satisfied in full by the treatment accorded the Lender Claims under the Plan. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the Plan Settlement and authorize the parties to take all actions that are necessary or appropriate to implement and give effect to the Plan Settlement.

Pursuant to the Plan Settlement and subject to the occurrence of the Effective Date, holders of an Allowed Lender Claim shall receive under the Plan in full and complete satisfaction of such Claim, its Pro Rata Share of (i) 87.5% of the Available Proceeds, (ii) 90% of the Shaw Stock, (iii) 20% of Avoidance Action Recoveries, and (iv) 75% of the first $10,000,000 of Estate Cause of Action Recoveries and 50% of Estate Cause of Action Recoveries thereafter. Pursuant to the Plan Settlement and subject to the occurrence of the Effective Date, each holder of an Allowed General Unsecured Claim against a Debtor shall receive on the Distribution Dates on account of its Allowed General Unsecured Claim, its Pro Rata Share of (i) 12.5% of the Available Proceeds, (ii) the proceeds from the sale or other disposition of 10% of the Shaw Stock in accordance with Section 7.9, (iii) 80% of Avoidance Action Recoveries, and (iv) 25% of the first $10,000,000 of Estate Cause of Action Recoveries and 50% of Estate Cause of Action Recoveries thereafter. With respect to holders of Litigation Unsecured Claims, each Litigation Unsecured Claim shall be liquidated and satisfied pursuant to the Plan ADR and to the extent any such Claim becomes an Allowed Litigation Unsecured Claim as provided in the Plan ADR in excess of available insurance proceeds (net of any deductible or self-insured retention payments) to pay such Claim, if applicable, the holder of such Claim shall receive on the Distribution Dates on account of its Allowed Litigation Unsecured Claim, its Pro

091

firms into the environmental services industry had increased competition for major federal government contracts and programs, which had been the Debtors' primary source of revenue in recent years.

### 3.     Employees.

As of the Petition Date, the Debtors' workforce consisted of approximately 6,400 full-time employees and approximately 390 part-time employees. Following consummation of the Shaw Transaction, the Debtors had sixteen full and part time employees.

The Debtors' current Chief Operating Officer is Harry J. Soose, Jr., who has held the position of the Chief Operating Officer of IT Group since May 2002. Mr. Soose also served as the Chief Financial Officer, a position held since August 1999. Mr. Soose started with IT Group in 1991 holding various operational finance and accounting positions. Prior to joining IT Group, Mr. Soose was employed with a real estate and home building company and before that with an international conglomerate with interests in transportation, manufacturing and the engineering and construction industries. Mr. Soose has a Bachelor of Science majoring in accounting and an MBA from Duquesne University and is a Certified Management Accountant and a Certified Public Accountant.

### 4.     Board of Directors of IT Group.

As of the Petition Date, the Debtors' board of directors was comprised of the following directors:

| | |
|---|---|
| Francis J. Harvey | Philip B. Dolan |
| James C. Mcgill | E. Martin Gibson |
| Richard W. Pogue | Robert F. Pugliese |
| Charles W. Schmidt | James David Watkins |
| Daniel A. D'Aniello | |

### 5.     Properties.

Prior to the Petition Date, the Debtors owned or leased property domestically at 154 sites in 38 states and the District of Columbia, and internationally at 18 principal sites located primarily in Canada and Australia. Excluding discontinued operations, the Debtors owned approximately 73 acres and leased approximately 2.1 million square feet of property for various uses, including regional and project offices, technology and process development laboratories, field remediation support service facilities, and corporate offices.

Additionally, the Debtors owned approximately 2,800 acres related to discontinued operations, principally in Northern California, of which approximately 900 acres were used for hazardous waste disposal facilities and approximately 1,900 were adjacent to those facilities, but were never used for waste disposal.

### 6.     The Prepetition Credit Facility and Subordinated Notes.

As of the Petition Date, IT Group and certain of its subsidiaries were parties to that certain Credit Agreement dated as of February 25, 1998, as amended and restated as of June 11, 1998 and further amended and restated as of March 7, 2000 (together with the other documentation executed in connection therewith and amendments thereto, the "Prepetition Credit Facility") with the lender parties thereto (the "Prepetition Lenders") and Citicorp USA, Inc. (the "Agent"), as administrative agent, Fleet National Bank ("Fleet") as documentation agent, and the institutions listed therein as Co-Agents. The obligations under the Prepetition Credit Facility are guaranteed by various subsidiaries of IT Group (such subsidiaries, collectively, the "Subsidiary Guarantors").

Under the Prepetition Credit Facility, the Prepetition Lenders provided the Debtors with revolving and term loan credit facilities and other financial accommodations. The aggregate obligations to the Prepetition Lenders outstanding as of the Petition Date were approximately $502 million in principal amount, plus interest thereon and

MIAMI 413827 v10 (2K)

092