EXHIBIT "5"

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re THE IT GROUP, INC.,** *et al.*, | Case No: 02-10118 (MFW) |
| **Debtors,** | Chapter 11 |
| | Jointly Administered |
| _____ | **Adv. No. 02-05486** |
| **JOHN ACCARDI, DAVID BACKUS, ROCHELLE BOOKSPAN, MELISSA DUBINSKY, DENNIS FENN, JOHN E. FOLEY, JOHN P. FRANZ, WILLIAM A. GAUNTT, TOM GRIMSHAW, DAVID HICKMAN, WARREN HOUSEMAN, STEPHEN KENNEY, HON. JAMES R. MAHONEY, Ph.D., THOMAS R. MARTI, DAVID W. MAYFIELD, ROY MCKINNEY, BILL MCINTOSH, DAVID C. MCMURTRY, DANIEL C. MELCHIOR III, GEORGEANN N. MOREKAS, WILLIAM C. PARIS, MATT RADEK, JAMES M. REDWINE, KEVIN R. SMITH, LOUIS STOUT, KEVIN SULLIVAN, and LEONARD YAMAMOTO, each individually and each in a representative capacity on behalf of the IT CORPORATION DEFERRED COMPENSATION PLAN, eff. January 1, 1996,** | **SECOND AMENDED AND RESTATED COMPLAINT *INTER ALIA* TO RECOVER BENEFITS DUE UNDER THE TERMS OF A PLAN (29 U.S.C. § 1132(A)(1)(B)); TO ENFORCE PARTICPANTS' RIGHTS UNDER THE TERMS OF THE PLAN AND TRUST (29 U.S.C. § 1132(A)(1)(B)); BREACH OF FIDUCIARY DUTIES (29 U.S.C. § 1132(A)(2), (A)(3)), AND TO OBTAIN OTHER RELIEF ***\***** |
| Plaintiffs, | **DEMAND FOR A JURY TRIAL** |
| v. | [ * Filed pursuant to order of the Court on February 26, 2003 denying Defendants' consolidated motion to dismiss] |
| **IT CORPORATION, THE IT GROUP, INC., and their affiliates in bankruptcy, as employers, fiduciaries, and sponsors of the Plan; THE CARLYLE PARTNERS II, LP as fiduciary of the Plan and/or tortfeasor; ANTHONY J. DeLUCA, FRANCIS J. HARVEY, and HARRY J. SOOSE as fiduciaries of the Plan and as officers; and the IT CORPORATION DEFERRED COMPENSATION PLAN, effective January 1, 1996 (nominal defendant, 1st C/R),** | |
| Defendants. | |

This is a proceeding to, *inter alia,* recover deferred salary, bonuses and interest owing to participants in a purportedly unfunded "top hat" deferred salary/compensation plan of IT Corporation (the "Plan"); to determine that The IT Group, Inc., and its affiliates including IT Corporation breached their fiduciary obligations to contribute funds sufficient to pay the participant's account balances in full prior to insolvency or bankruptcy to a trust established for the sole and exclusive benefit of the participants—by placing the decision when to fund the Plan in the hands of a Committee of officers with serious conflicts of interest, by the negligent conduct of two Presidents and CEOs and other fiduciaries, and by the improper intervention of an investment fund in control of The IT Group, Inc., and its affiliates; breached their fiduciary obligation to inform all participants to withdraw immediately from the Plan in December 2001 when the decision not to fund the Plan had been made in or around November 2001; to determine that such Plan is not a top-hat plan, and to obtain relief for failure of The IT Group, Inc., and its affiliates, to meet ERISA's minimum funding obligations during the entire period of the Plan's existence, 1996 – 2001, in violation of, *inter alia*, 29 U.S.C. §§ 1082, 1103, 1104, and 1109.

The above-plaintiffs (the "Plaintiffs") hereby allege as follows:

## THE PARTIES

1.     Each and every Plaintiff is an individual and former employee/officer of the IT Corporation and a participant in the Plan.  Their addresses are listed in the undersigned counsel's Bankruptcy Rule 2019 statement filed/entered in the Debtors' bankruptcy case on September 6, 2002, docket # 2044, and are incorporated herein by reference in its entirety.

2.     The Plaintiffs are authorized to bring suit on behalf of themselves individually and on behalf of the Plan pursuant to 29 U.S.C. § 1132.

3.     IT Corporation is a duly authorized California Corporation.  The IT Group, Inc. ("IT Group"), is a duly authorized Delaware Corporation and the ultimate parent company of 92 direct

and indirect affiliates/subsidiaries including IT Corporation.  ITC was IT Corporation's parent

company until ITC changed its name to "The IT Group, Inc." on or about December 28, 1998.  The

IT Group along with 69 of its direct and indirect subsidiaries are debtors and debtors-in-possession

in bankruptcy cases (collectively, the "Debtors") now pending before the United States Bankruptcy

Court, District of Delaware, jointly administered under Case No. 02-10118 mfw.  (The non-debtor

affiliates are not named defendants herein).  The principal place of business and headquarters of IT

Corporation and the IT Group, is 2790 Mosside Boulevard, Monroeville, Pennsylvania.

      4.      The Debtors' bankruptcy cases were filed on January 16, 2002 (the "Petition Date").

      5.      The Carlyle Partners II, LP ("CP II") is an investment firm and limited partnership

incorporated in Delaware on September 26, 1994, whose principal business is as an investment

fund, acquiring control investments in connection with management buyouts, restructurings,

bankruptcies, and making strategic investments in public and private companies.  CP II is part of a

family of investment funds in the name of the Carlyle Group.  CP II is one of eight limited

partnerships, one offshore partnership (collectively, the "Purchasers"), and an affiliate limited

liability company (the "Affiliate"), that acquired preferred stock convertible into common stock,

and warrants to purchase common stock of International Technology Corporation, a Delaware

corporation ("ITC") in November 1996.  The Purchasers are: (i) Carlyle Partners II, L.P. ("CPII"), a

Delaware limited partnership; (ii) Carlyle Partners III, L.P. ("CPIII"), a Delaware limited

partnership; (iii) Carlyle International Partners II L.P. ("CIPII"), a Cayman Islands limited

partnership; (iv) Carlyle International Partners III L.P. ("CIPIII"), a Cayman Islands limited

partnership; (v) C/S International Partners ("C/SIP"), a Cayman Islands partnership, (vi) Carlyle

Investment Group, L.P. ("CIG"), a Delaware limited partnership; (vii) Carlyle-IT Partners, L.P.

("CIT"), a Delaware limited partnership; (viii) Carlyle-IT International Partners, L.P. ("CITI"), a

Cayman Islands limited partnership; (ix) Carlyle-IT International Partners II, L.P. ("CITII"), a

3

Cayman Islands limited partnership (collectively, the "Purchasers"). TC Group is the sole general partner or sole managing general partner of each of the Purchasers. The Affiliate is Carlyle Investment Management, L.L.C. ("CIM"), a Delaware limited liability company.

6.    At all times relevant herein, Francis (Jack) Barker (not a defendant herein) was and is a managing director of CP II and CP III, two "U.S. buyout Funds," part of the Telecommunications and Media Group, and authorized agent and/or representative of CP II and CP III.

7.    At all times relevant herein, Philip B. Dolan (not a defendant herein) was and is a managing director for CP II and CP III, two "U.S. Buyout Funds," part of the Telecommunications and Media Group, and authorized agent and/or representative of CP II and CP III.

8.    CP II's principal business address is Delaware Trust Building, 900 Market Street, Suite 200, Wilmington, Delaware, 19801.

9.    CP II's headquarters is located at 1001 Penn. Ave., NW, Suite 200, Washington, D.C. 20004.

10.   Robert B. Sheh (not a defendant herein) was the President and Chief Executive Officer of ITC until July 1, 1996, and at all relevant times prior thereto.

11.   Anthony J. ("Tony") DeLuca was the President and Chief Executive Officer of ITC and the IT Group, from no later than June 27, 1996, through November 13, 2001. Mr. DeLuca's current address is believed to be 7504 Happy Valley Rd., Woodstock, VT 05091-8093.

12.   Francis Harvey was the acting President and Chief Executive Officer of the IT Group, from November 13, 2001, through and after the Petition Date, and resides at 116 Twin Oaks Dr., Los Gatos, California 95032-5650.

13.   Harry J. Soose was and is currently an officer of the IT Group. On August 16, 1999, Mr. Soose was appointed a member of the committee charged with administering the Plan (the

"Committee") per Article 10 of the Plan, and continued as a member of the Committee thereafter through all times pertinent herein.  A true and correct copy of the memorandum appointing Mr. Soose as a member of the Committee is attached as Exhibit "1."  (bate stamp 51)

14.     Mr. Soose was appointed acting Chief Executive Officer of the IT Group, after the Petition Date.  Mr. Soose's business address is c/o the IT Group, 2790 Mosside Boulevard, Monroeville, PA 15146.

### STANDING

15.     Each Plaintiff as a participant in the Plan has an interest in the security of his or her benefits under the Plan; each Plaintiff has been injured as a direct result of the Defendants' conduct in that the Debtors allege that the Plan has no assets; the Plan has not paid the obligations owing to each and every Plaintiff (see ¶ 19) and participant with an outstanding account balance; the conduct and omissions of each Defendant alleged herein are directly responsible for the failure of IT Corporation, the IT Group, and their affiliates to contribute sufficient funds to provide the promised benefits to a trust established for the sole and exclusive benefit of the participants if there ever was a risk of insolvency or bankruptcy and to pay the obligations owing each Plaintiff; and Plaintiffs' claims generally fall within the interests sought to be protected by the Plan and by 29 U.S.C. § 1001 *et seq.* ("ERISA").

### JURISDICTION AND VENUE

16.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), and pursuant to order of the United States District Court, District of Delaware, entered September 6, 2001, reinstating the automatic reference of chapter 11 cases to the United States Bankruptcy Court, District of Delaware.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

18.     This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## BACKGROUND FACTS

19.     On or about July 5, 1995, the Board of Directors of ITC approved and adopted a

deferred salary/compensation plan for officers and directors and employees captioned of IT

Corporation captioned "IT Corporation Deferred Compensation Plan effective January 1, 1996"

(the "Plan").  A true and correct copy of the Plan is attached as Exhibit "2," (bate stamp 52) whose

terms are incorporated herein by reference in their entirety.

20.     Plaintiffs are each individually owed by the Plan amounts deducted from their

paychecks—deferred salary, back-wages, bonuses and interest—per each Plaintiff's Statement of

Account dated December 31, 2001, provided by Clark Bardes Consulting using information

provided by IT Corporation:

| | | |
|---|---|---:|
| a. | Accardi, John | $  78,695 |
| b. | Backus, Dave | 83,025 |
| c. | Bookspan, Rochelle | 429,108 |
| d. | Dubinsky, Melissa | 35,554 |
| e. | Fenn, Dennis | 18,013 |
| f. | Foley, James | 13,388 |
| g. | Franz, John P. | 25,464 |
| h. | Gauntt, William A. | 122,960 |
| i. | Grimshaw, Tom | 95,615 |
| j. | Hickman, David | 3,043 |
| k. | Houseman, Warren | 40,303 |
| l. | Kenney, Stephen | 211,079 |
| m. | Mahoney, Hon. James R. | 303,763 |
| n. | Marti, Thomas R. | 119,616 |
| o. | Mayfield, David | 29,437 |
| p. | McKinney, Roy | 13,504 |
| q. | McIntosh, Bill | 2,550 |
| r. | McMurtry, David C. | 77,185 |
| s. | Melchior III, Daniel C. | 41,900 |
| t. | Morekas, Georegann N. | 23,704 |
| u. | Paris, William C. | 50,336 |
| v. | Radek, Matt | 38,876 |
| w. | Redwine, James M. | 25,709 |
| x. | Smith, Kevin R. | 213,483 |
| y. | Stout, Louis | 13,282 |
| z. | Yamamoto, Leonard | <u>52,629</u> |
| | Total: | <u>$2,162,221</u> |

**6**

21.    True and correct copies of each Plaintiff's Statement of Account, evidencing the foregoing amounts, are attached as Exhibit "3" (bate stamp 76).

22.    There are additional participants in the Plan who are not now named-plaintiffs, but to whom the Plan owes money.  The total number of such participants is unknown, as is the total amount of unpaid account balances owing by the Plan.

23.    The Debtors, post-petition, have alleged by and through their counsel that the Plan has no assets and has never held any assets.

### Assurances That Benefits Were Protected: Promises/Representations Regarding Contributions and Payment of Benefits, the Withdrawal Election and the Rabbi Trust

24.    The purpose of the Plan is to "provide specified benefits," purportedly to various "non-employee directors and a select group of management or highly compensated employees who contribute materially to the continued growth, development and future business success of IT CORPORATION . . ."  (Exhibit "2," bate stamp 56 (Plan at 1, Purpose))

25.    Under the Plan, an employer is bound to pay the amounts deferred by plan participants pursuant to, *inter alia*, Article 13.1 of the Plan, purportedly an unsecured claim: ("An Employer's obligation under the Plan shall be merely that of an unfunded and unsecured promise to pay money in the future.")

26.    IT Corporation is an Employer under the Plan, as are all other affiliates authorized by the Board of Directors of IT Corporation.

### The Funding/Exclusive Benefit Obligations

27.    Several months prior to or concurrent with the creation of the Plan on or about January 1, 1996, two authorized executive officers of ITC, including the President and CEO of ITC (the "Executive Officer(s)"), held a series of meetings at ITC's corporate headquarters in Torrance, California.

7

28.    During the meetings, the Executive Officers made various statements and representations to small groups of senior officers, management and professional personnel and employees of ITC, IT Corporation, and their affiliates, including to Dr. James R. Mahoney (the "Prospective Participants"), about the prospective Plan.

29.    The Executive Officers encouraged the Prospective Participants to enroll and participate in the Plan.

30.    Dr. James R. Mahoney, and other Prospective Participants, questioned the Executive Officers regarding the provision in the Plan purporting to make the Plan "unfunded" and making Plan assets, if any, subject to the claims of all creditors of the Employers.

31.    The President and CEO stated, represented and promised to Dr. James R. Mahoney, and to other Prospective Participants, *inter alia*, that if the company (understood to mean ITC, IT Corporation, and all of their affiliates) were ever at risk of insolvency or bankruptcy, the company would contribute sufficient funds to pay the promised benefits to a trust established for the sole and exclusive benefit of the participants; and that such amounts would in fact be paid in full to all participants in the Plan  (hereinafter referred to as the "Funding/Exclusive Benefit Obligations").

32.    The Executive Officers had private discussions with Dr. James R. Mahoney, and other Prospective Participants, making and re-confirming the Funding/Exclusive Benefit Obligations.

33.    Given that the purpose of the group- and private-meetings was to explain the features of a new benefit plan, and given the positions of the Executive Officers, including the President and CEO, within the company, the President and CEO and the Executive Officers reasonably expected to induce Dr. James R. Mahoney and other Prospective Participants to enroll in the Plan.

34.     Through the Funding/Exclusive Benefit Obligation, the President and CEO and the Executive Officer did in fact induce Dr. James R. Mahoney and other Prospective Participants to enroll in the Plan.

35.     The President and CEO intended that: (a) the Funding/Exclusive Benefit Obligations provide meaningful, *bona fide* protections to the Plan and to future participants, and not constitute an illusory promise that would actively mislead participants in that the Plan already required the Employers to pay contractual obligations owed participants; (b) that the decision whether to perform such obligations would be a fiduciary decision made solely in the interests of the participants and not in the business discretion of ITC, IT Corporation, or their affiliates, and (c) that the Funding/Exclusive Benefit Obligations be an integral part of the terms of the Plan.

36.     Dr. James R. Mahoney and the Prospective Participants were aware of the Funding/Exclusive Benefit Obligations and believed that they were protected from the risks of insolvency and bankruptcy.

37.     Dr. James R. Mahoney, and other Prospective Participants, relied upon the oral representations, i.e., the Funding/Exclusive Benefit obligations, and would not have agreed to enroll without their benefit.

38.     ITC and its affiliates wanted senior employees at the headquarters to participate so as to induce other participants (e.g., lower-level management and professional employees) to enroll in the Plan.

39.     The Funding/Exclusive Benefit Obligation was omitted from the Plan intentionally or mistakenly; inclusion of such obligation in the Plan would have put at risk the purported "unfunded" status of the Plan and its purported top-hat status.

40.     The Executive Officers provided additional assurances of payment citing the provision in the Plan providing for cash withdrawal of a participant's account balance at any time

subject to a 15% early withdrawal penalty (the "Withdrawal Election"), as another provision safeguarding amounts owed to participants.  (Exhibit "2," bate stamp 63 (Plan ¶ 4.3 at 8))

41.    The Executive Officers had actual and apparent authority to make the Funding/Exclusive Benefit Obligations to the Plan, by and on behalf of ITC, IT Corporation, and their affiliates.

42.    The Funding/Exclusive Benefit Obligations are part of the terms of the Plan.

43.    The summary description of the Plan provided to participants from 1997 to 1998 assured participants that their benefits were protected, stating on page 1 that "[a] 'Rabbi Trust' has been established in order to provide benefit security.  The Trust is specially designed so that assets will be deposited in the trust if certain events should take place . . ." and cited the "Withdrawal Election" as additional security.  The summary description is captioned "IT Corporation Deferred Compensation Plan (DCP) Questions and Answers" (hereinafter "1997 Summary Description"), a true and correct copy of which is attached at Exhibit "4" and is incorporated herein by reference in its entirety. (Exhibit "4," bate stamp100)

44.    The 1997 Summary Description fails to describe the Funding/Exclusive Benefit Obligations.

45.    When ITC changed its name to the IT Group, the IT Group and its affiliates became the successor to the obligations arising under the Funding/Exclusive Benefit Obligations.

**The Shell Game: IT Corporation Channeled Money Withheld
From Paychecks to Itself for the Company's Use (Even After the Decision Was
Made Not to Fund the Plan)**

46.    IT Corporation withheld amounts from each Plaintiff's paycheck pursuant to the terms of the Plan from January 1996 through December 2001, per paragraph 19 *supra*, and used such funds, both in the operation of its business and the business of its affiliates, tendering the funds

to various creditors and vendors of ITC, the IT Group, and their affiliates, at the discretion of the

President and CEO of ITC and the IT Group.

47.    Such withholding continued through December 2001—even though the decision not

to perform vis-à-vis the Funding/Exclusive Benefit Obligations was made in or around November

2001.  No one informed the participants of the decision not to perform.

48.    From mid-1996 through the Petition Date, Anthony DeLuca and Francis Harvey, as

Presidents and CEOs of ITC and/or the IT Group, each had ultimate authority to exercise control

over all amounts deferred from each employee/participant's paycheck, over whether such amounts

would be placed in trust for the Plan and held for the exclusive benefit of the participant, and over

whether such amounts would be used by, or tendered to various creditors and vendors of ITC and/or

the IT Group, at their discretion; and each had ultimate authority and responsibility to decide

whether to continue with the policies implemented.

**IT Corporation Then Attempted to Shift Responsibility, And Liability, for the Plan To Others
And Sought to Ensure That Employees/Participants Would Not Demand Funding—
Through the Terms of the Plan, the Master Trust Agreement, and Its Own Actions**

49.    The terms of the Plan allow the President/CEO of IT Corporation to select three

individuals to whom administration of the Plan would, purportedly, be delegated.  The Committee

"shall also have the discretion and authority to make, amend, interpret, and enforce all appropriate

rules and regulations for the administration of this Plan and decide or resolve any and all questions

including interpretations of the Plan, as may arise in connection with the Plan. . . ." (Exhibit "2,"

bate stamp 69 (Plan, Article 10, ¶ 10.1, at 14))

50.    It was a Plan policy that certain management officers, the Chief Legal Officer, Chief

Financial Officer, and Corporate Director - Human Resources, would be members of the

Committee; and from 1996 through all times pertinent herein, such personnel were members of the

Committee.  The IT Group continued this policy per memo from the President and CEO of the IT Group, on August 16, 1999.  (Exhibit "1," bate stamp 51)

### The Committee Funding Commitment

51.     The decision when the Employers would transfer assets to the Plan in trust to pay participants was a decision of the <u>Committee</u>, and not one in the business discretion of the employers authorized to participate in the Plan: "[t]he Employers . . . shall transfer over to the Trust such assets, if any, as the <u>Committee</u> determines, from time to time and in its sole discretion, are appropriate" (the "Committee Funding Commitment") (Exhibit "2," bate stamp 72 (Plan at 17, ¶ 12.1))

52.     The 1997 Summary Description provided to prospective enrollees fails to describe the Committee Funding Commitment as a mechanism to protect participants—ensuring that employees/participants would not pressure Committee members to utilize ¶ 12.1 to protect participants.

53.     Each member of the Committee has an individual discretionary role as to plan administration.

54.     The terms of the Plan provide that a trust would be established.

55.     No trustee is identified for the trust mentioned in the Plan.

56.     No trustee is identified in the 1997 Summary Description of the Plan purporting to comprehensively disclose to participants their respective rights and obligations under the Plan.

57.     IT Corporation initially retained Compensation Resource Group, which later changed its name to Clark Bardes Consulting ("Clark Bardes"), as the purported "administrator" of the Plan on December 17, 1995.  A true and correct copy of the Servicing Agreement with Clark Bardes is attached hereto as Exhibit "5," and whose terms are incorporated herein by reference in their entirety.

58.     However, in the servicing agreement with Clark Bardes, Clark Bardes expressly disclaims and denies any responsibility for administration and operation of the Plan and Trust: "The Client shall at all times be responsible for the proper administration and operation of the Plan and Trust . . . " (Exhibit "5," bate stamp 115 (Servicing Agreement at 2, ¶ 3))

## The Master Trust Agreement

59.     IT Corporation adopted a trust agreement for the Plan captioned "IT Corporation Master Trust Agreement for Deferred Compensation Plans," effective January 1, 1996 (the "Master Trust Agreement"), a true and correct copy of which is attached as Exhibit "6," and whose terms are incorporated herein by their entirety.  (Exhibit "6" bate stamp 126)

60.     A copy of the Master Trust Agreement was never provided to any plaintiff until after the Petition Date; its terms consequently were never disclosed to any participant.

61.     The failure to identify the Trustee in the 1997 Summary Description (*supra*), and the failure to provide a copy of the Trust, ensured that employees/participants would ever contact and pressure the trustee to seek funding of the Plan.

62.     The Master Trust Agreement provides that a trustee will be appointed, but that the Committee has complete control and authority over the trustee: "the Committee shall direct the Trustee as to the administration of the Trust in accordance with the following provisions:

    (a)  [procedures for identifying Committee members omitted],

    (b) [directions by the Committee must be in writing—omitted],

    (c) The Trustee may <u>conclusively rely upon directions from the Committee in taking any action with respect to this Master Trust Agreement</u>, including the making of payments from the Trust Fund. . . .  The Trustee shall have no liability for actions taken, or for failure to act, on the direction of the Committee.  The Trustee shall have no liability for failure to act in the absence of proper written directions."

(Exhibit "6" bate stamp 132-33 (Master Trust Agreement ¶ 2.1, at 3-4) (emph. added))

63.    The Master Trust Agreement provides—squarely contradicting the Plan—that the

Employers shall have the sole discretion to decide whether to make contributions to the Plan:

> "The Company and the Subsidiaries, in their sole discretion, may at any time, or from time to time, make additional deposits of cash or other property in trust with the Trustee to augment the principal to be held, administered and disposed of by the Trustee as provided in this Master Trust Agreement.  <u>Neither the Trustee nor any Participant or Beneficiary shall have any right to compel such additional deposits</u>.  The Trustee shall have no duty to collect or enforce payment to it of any contributions or to require that any contributions be made, and shall have no duty to compute any amounts to be paid to it nor to determine whether amounts paid comply with the terms of the Plan."

(Exhibit "6," bate stamp 133 (Master Trust Agreement ¶ 2.3, at 4) (emph added))

### The Committee's Irreconcilable Conflict of Interest

64.    Under the Plan and Trust, each member of the Committee is a fiduciary,

administrator and a *de facto* trustee in control of the named trustee and consequently has the duty to

make decisions regarding the administration of the Plan in the sole interests of the Plan as a whole

and all of its participants, including decisions regarding when to transfer assets to the Plan/trust.

65.    As employees of ITC, the IT Group, IT Corporation and/or their affiliates, each

member of the Committee had substantial career and financial interests in furthering the financial

and economic interests of their respective employer.  Each member of the Committee was

subordinate to the President and CEO of ITC and the IT Group, and owed a duty of loyalty to these

entities.

66.    From January 1, 1996, through the Petition Date, ITC and the IT Group, IT

Corporation, and their affiliates were at all times in a position to profit from not funding the Plan; it

had a financial incentive to not fund the Plan because each participant paid would constitute

expenses incurred.

67. There is a serious, irreconcilable conflict of interest under the Plan and the Trust between the fiduciary duties of the Committee, on the one hand, and the business interests of ITC, the IT Group, IT Corporation, and their affiliates, on the other.

68. As a consequence of the terms of the Plan placing administrative decisions including contributions-decisions with a conflicted Committee indebted to upper-management, the Master Trust Agreement ultimately giving contribution authority to the "Employers," and Clark Bardes expressly denying any authority over the administration and operation of the Plan, ITC and the IT Group, and the President and CEO of ITC and the IT Group, were the entities/persons with actual authority to decide whether an employer would transfer assets to the Plan to a trust, for the sole and exclusive benefit of the participants.

69. ITC and the IT Group, and the Presidents and CEOs of ITC and the IT Group, are *de facto* trustees of the trust identified in the Plan, and are fiduciaries of the Plan and trust.

**Through the Negligence and/or Affirmative Decisions of the Committee, of the Presidents and CEOs of the IT Group, and of CP II—IT Corporation, the IT Group, and their Affiliates Decided to Profit By Not Funding the Plan**

70. Prior to or during November 2001, at least one officer of the IT Group, and/or IT Corporation was prepared and had decided to perform vis-à-vis the Funding/Exclusive Benefit Obligations. Such officer was countermanded, and ordered not to perform, as addressed *infra*.

71. Prior to or during November 2001, the Committee either negligently did nothing to cause the IT Group and its affiliates to perform the Funding/Exclusive Benefit Obligations, or determined to favor the interests of the IT Group and its affiliates and not demand performance of the Funding/Exclusive Benefit Obligations, in violation of their responsibilities under ¶ 12.1 of the Plan and the Plan's stated purpose, thereby sacrificing and improperly disregarding the valid, vital interests of the Plan as a whole and of the Plaintiffs, in order to advance the interests of non-beneficiaries.

15

121

72.     In or around November 2001, CP II took and assumed authority under the Plan from the Committee (Plan, Article 12, ¶ 12.1) and actual authority from the IT Group and Messrs. DeLuca and Harvey, regarding whether assets should be transferred to the Plan and, whether the IT Group, would perform the Funding/Exclusive Benefit Obligations, and actually made the ultimate decision that the IT Group and its affiliates would not perform, countermanding the previous intention to the contrary.

73.     By such actions CP II caused the IT Group and its affiliates, Messrs. DeLuca and Harvey, and the Committee to relinquish improperly their fiduciary status under the Plan, and/or arising under ERISA, their respective independent discretion and decision-making powers over the Plan.  CP II consequently assumed a discretionary role as to Plan administration, and actually exercised discretionary control and authority vis-à-vis the Plan.

74.     Messrs. DeLuca and Harvey, are responsible for the failure to perform the Funding/Exclusive Benefit Obligations, by negligently doing nothing, by their affirmative acts, and/or by consenting expressly or implicitly to the assumption of independent discretion and decision-making powers over the Plan and Trust by CP II, thereby sacrificing and improperly disregarding the valid, vital interests of the Plan as a whole and of the Plaintiffs, in order to advance the interests of non-beneficiaries.

**Demands for Payment-in-Full in November 2001; IT Corporation's Response**

75.     Many participants made demand for payment of the balance in their Plan account prior to and during December 2001.

76.     Authorized representatives of the IT Group, and its affiliates misrepresented that the payment demands would be met, through December 2001 and January 2002.  For example, Mike Pepperney, a Vice President and officer, confirmed by e-mail that Ms. Bookspan was "scheduled

for payment" for approximately 85% of the Account balance (the total amount less an early-withdrawal penalty) on January 2, 2002 (the "Payment Representations").

77.    The Human Resources Department of IT Corporation offered participation in the Plan to new employees as late as December 2001 ("New Enrollment Representations").

**Estoppel Allegations:**

78.    Many Prospective Participants considering whether to enroll in the Plan believed that the Funding/Exclusive Benefit Obligations were material to their decision to enroll.

79.    In late 1995, it was widely believed by personnel at ITC and its affiliates that the company as a whole was having some financial difficulty; it was understood that the largest component of an employee's compensation is usually salary and bonuses; and that, absent the Funding/Exclusive Benefit Obligations, deferring any part of an employee's salary pursuant to the prospective Plan might put any amount deferred at risk of non-payment.

80.    The Prospective Participants and later participants relied upon the Funding/Exclusive Benefit Obligations and upon the other assurances of payment in evaluating their decision regarding whether to join in participating in the Plan or were the intended beneficiaries of such representations.

81.    The Prospective Participants had the right to rely, and reasonably relied, upon the Funding/Exclusive Benefit Obligations given the position of the Executive Officers with authority over all aspects of the operations of ITC and its affiliates.

82.    The Prospective Participants relied to their detriment upon the Funding/Exclusive Benefit Obligations in that ITC and subsequently the IT Group, and their affiliates, breached and/or failed to perform the promises contained therein.

83.    The IT Group and its affiliates are equitably estopped from denying its promise to contribute sufficient funds to pay the promised benefits in full to a trust established for the sole and

exclusive benefit of the participants if there were ever a risk of insolvency or bankruptcy; and that such amounts would in fact be paid in full to all participants in the Plan; and from denying the obligation to pay the Plan participants in full in the amount of each Plaintiff's outstanding unpaid account balances for each Plaintiff's Statement of Account.

84.    Denial of the obligation of the IT Group and its affiliates to make such payments and pay the participants in full would injure and damage the relying parties by, *inter alia,* precluding Plaintiffs from asserting secured, first priority claims against the Debtors' bankruptcy estate pursuant to 29 U.S.C. § 1082(f)(1)–(4) and 11 U.S.C. § 503(b)(1)(B).

### Enrollment of Participants

85.    There were only 11 participants when the Plan was first adopted on January 1, 1996.

86.    The terms of the Plan, including the Funding/Exclusive Benefit Obligations discussed *supra*, constituted an offer for a unilateral contract.

87.    Prior to enrolling, each participant was to be provided with a copy of the Plan and a summary description of the Plan, such as the 1997 Summary Plan Description.

88.    Each Plaintiff enrolled and many re-enrolled in the Plan at various times from January 1, 1996, through the Petition Date, by executing a document captioned "Plan Agreement" or functionally similar document.  (A true and correct copy of one form of Plan Agreement is attached as Exhibit "7," whose terms are incorporated herein by reference in their entirety).

89.    Each Plaintiff executed a "Beneficiary Designation and Spousal Consent Form, in which each Plaintiff elected to defer a fixed percentage of his or her income.

90.    Each Participant in the Plan, including all of the Plaintiffs, elected to defer some, in some cases virtually all, of their base salary and year-end bonuses.

91.    Each Plaintiff executed an election form or forms in which each Plaintiff was required to, and did, make an election instructing IT Corporation as to how distributions should be made in the future from their account, e.g., monthly payments upon retirement, or upon termination.

92.    During the time each Plaintiff participated in the Plan, each rendered continuous service to IT Corporation.

93.    At all relevant times during the enrollment of each Plaintiff, each Plaintiff either performed all requirements/obligations imposed upon them by the Plan as noted above, and fully accepted the unilateral offer embodied in the Plan and the Funding/Exclusive Benefit Obligations, creating a binding contract; and IT Corporation, and the IT Group and its affiliates, intended that the Plaintiff be a beneficiary of the terms of the Plan including the Funding/Exclusive Benefit Obligations.

94.    Each Plaintiff is a member/participant of, and is entitled to enforce the rights provided for by, the Plan; and qualifies for benefits provided by the Plan.

**The Plan is Not Exempt from ERISA as a "Top Hat" Plan:**

95.    The Plan was not "unfunded" within the meaning of ERISA, because of, *inter alia*, the existence of the Funding/Exclusive Benefit Obligations, and the Committee Funding Commitment.

96.    During the period from 1996 through 2001, participation in the Plan was actually offered to substantial numbers of non-management personnel of ITC and the IT Group and their affiliates, including many Plaintiffs.

97.    Participation in the Plan was offered to, *inter alia,* engineers, scientists, and sales personnel, including many Plaintiffs, who were not high ranking management and who did not have executive authority including authority relating to management of the IT Group and its corporate policies, or the ability to influence, control or direct such policies of the IT Group and its affiliates.

98.     Such engineers, scientists, and sales personnel, including many Plaintiffs, were compensated solely because of their scientific or technical expertise relating to environmental remediation projects or expertise regarding sales and business promotion.

99.     In or around August 1998:

a.     ITC had many pay grade levels including "non-executive" pay-grade levels "E-12" through "E-15," and several "executive" pay-grade levels "E-15" and higher, possibly as high as E-20.  A true and correct copy of an ITC Job Table is attached as Exhibit "8" (bate stamp 152), whose terms are incorporated herein by reference in their entirety.

b.     within pay grade levels E-12 through E-15, there were multiple subcategories for various job titles (*Id.*);  pay grade level E-12 had nineteen (19) subcategories, E-13 had ten (10) subcategories, and E-14 had fifteen (15) subcategories, many of which were subcategories for scientists, engineers, or other technical personnel.  (Exhibit "8"; bate stamp 153-54);

c.     participation in the Plan was offered to employees at widely varying levels (Exhibit "8"; bate stamp 153-54).

100.    During the period from 1996 through 2001, participation in the Plan was offered to the following plaintiffs:

a.     Participation was offered to David Mayfield when he was Director of Business Development, Energy & Nuclear Operations.  His pay grade was E-12.  He was a engineer/sales person, responsible for developing new business for IT Corporation, focusing on DOE clients.  He developed proposal strategy, led company proposals, and assisted in overall marketing efforts for the company.  He once approved an "add-on" to an existing contract worth less than $100,000.  He signed one or two teaming agreements with a $5-10 million dollar value, and was subsequently told that he didn't have authority to sign such agreements.  He was not an

20

126

officer of the company, and had no duties regarding management of the company or setting corporate policies.

b.      Directors of Business Development with the IT Group generally had no authority to approve any proposals, contracts, contract changes, teaming agreements, or non-disclosure agreements.   Attached is a true and correct copy of the IT Group's "Authority Limits – Proposals and Contracts" from November 2000, which is incorporated herein in its entirety, listing the various authority limits for various classes of employees.  (Exhibit "9," bate stamp 155)

c.      Participation was offered to a Business Line Manager (who is not a plaintiff herein), who was not an officer of the company, and had no authority to enter into bids, proposals, and contracts on behalf of the IT Group and its affiliates.

d.      3rd Level Business Line Managers with the IT Group generally had no authority to enter into proposals, contracts, contract changes, teaming agreements, and non-disclosure agreements.  (Exhibit "9; bate stamp 156)

e.      Participation was offered to Casey Kenney when he became a Project Manager in Florida on an environmental remediation project.  He was not an officer of the company, did not sign contracts on behalf of the IT Group, and had no duties regarding management of the company or setting corporate policies.  Participation was offered to him through the e-mail.  He believes his pay grade was E-13 or E-14.

f.      Project Managers with the IT Group generally had no authority to enter into any proposals, contracts, contract changes, teaming agreements, or non-disclosure agreements. (Exhibit "9"; bate stamp 156)

g.      Participation was offered to Matt Radek when he was a Program Manager, selling and directing the performance of certain contracts relating to, *inter alia,* environmental

cleanup; he was not an officer of the company, and had no duties regarding management of the company or setting corporate policies.  His pay grade was E-13.

        h.      Participation was offered to Stewart Bornhoft[1] when he was hired as a Program Manager, pay grade E-13.  He was responsible for supervising ten employees, and worked with 22 Project Managers in charge of task orders received from the Navy, to remediate hazardous and toxic waste on 18 bases in California.  He was not an officer of the IT Group or its affiliates; and was not responsible for management of the policies of IT Group and its affiliates.

        i.      Program Managers with the IT Group generally had only limited authority.  They could not approve contracts, bids, or proposals, make changes to contracts, approve teaming agreements or non-disclosure agreements.  Program Managers only had limited authority to enter into cost reimbursement delivery orders with the Federal Government, and approve contract changes relating to the same.  (Exhibit "9"; bate stamp 156)

        j.      Participation was offered to William McIntosh when he was a Director of Business Development.  His duties included communicating with federal DOD customers, building and negotiating teaming agreements, and directing proposals for submission to federal customers relating to, *inter alia,* environmental cleanup. He never had authority to sign such agreements, and had no duties regarding management of the IT Group or setting corporate policies.  He was not an officer of the IT Group.  He believes his pay grade was approximately E-14.

        k.      Participation was offered to Thomas Grimshaw when he became Director of Corporate Development.  His duties primarily involved managing due diligence investigations into potential acquisition candidates, preparing short-term integration plans, and providing mergers & acquisitions support; however, he did not participate in negotiations with target companies.  He was not an officer of the company, and had no duties regarding management of the company or setting

corporate policies, and could not approve proposals, contracts, or other agreements.  His pay grade was E-14.

l.        Additional plaintiffs may have been offered participation notwithstanding their employment at non-executive pay grades.

m.        Additional participants, who are not named plaintiffs, were offered participation in the Plan at non-executive pay grades, such as E-12.  Such participants were not officers and did not have duties regarding management of the company or setting corporate policies, and also did not have authority to execute proposals, bids, contracts, teaming agreements, and non-disclosure agreements.

101.        Participation in the Plan was offered to substantial numbers of engineers, scientists, and sales personnel, earning "non-executive" pay-grade levels, at levels E-12, E-13, E-14, and E-15.

102.        During the period from 1996 through 2001, participation in the Plan was actually offered to a large, substantial number of personnel of ITC, the IT Group and their affiliates, including many Plaintiffs, who:

a.        did not have the ability to influence, control or direct the organization and its corporate policies;

b.        did not have sufficient influence to negotiate arrangements that protect their pension benefits from diminution and who lacked the bargaining power to obtain nonforfeitable benefits;

c.        were not equipped to protect their interests in the employee benefits bargaining process, had such a process ever occurred during their employ (which it did not); and

---

[1] Plaintiffs will be filing a motion to add Mr. Bornhoft as a co-plaintiff.

   d.  did not have the ability to negotiate, i.e., affect or substantially influence, through negotiation or otherwise, the design, operation or terms of the Plan, or protect his or her retirement benefits offered under the Plan.

   103. No participant in the Plan ever had a reason to hire counsel to facilitate negotiations regarding the terms of the Plan as participation in the Plan was offered on a take-it-or-leave-it basis.

   104. The Plan was offered to many participants who were not members of a select group of management or a select group of highly compensated employees, within the meaning of, *inter alia,* 29 U.S.C. §§ 1051, 1081, and 1101.

   105. The Plan is qualitatively different from the 401k Plan provided by IT Corporation and, accordingly, is not a supplement to the 401k plan or any other plan.

   106. The Plan was not maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.

   107. The Plan was not a "top-hat plan" *ab initio*, or lost its status as a "top-hat plan" exempt from ERISA's funding and fiduciary requirements, after January 1, 1996.

### The Plan is Subject to ERISA[2]:

   108. The Plan allows participants to make a distribution election to defer income until various times after an employee is terminated.  (Plan ¶ 5.2 at 9: "Such [Termination] Benefit shall be payable in either a lump sum or in equal monthly payments over a period of 60, 120 or 180 months, as selected by the Participant . . .").

---

[2] The Debtors' counsel, arguing on behalf of all the Defendants at the hearing held February 26, 2003 (2 pm), regarding the "Defendants' Consolidated Motion to Dismiss the [First] Amended Complaint" (docket #22), represented to the Court that ERISA covers the Plan.  (Tr. 2-26-03 at 7, 29, and 70)  Plaintiffs reserve the right to assert that the Defendants are judicially-, and/or equitably-estopped from denying that ERISA covers the Plan.

109.    The Plan allows participants to make a distribution election to defer income until retirement. ("A Participant who retires shall receive, as a Retirement Benefit, his or her Account Balance. [And upon commencement of participation in the Plan] shall elect . . . to receive the Retirement Benefit in a lump sum or in equal monthly payments over a period of 60, 120, or 180 months. . . ."). (Exhibit 2, bate stamp 54 (Plan ¶ 5.1 at 9))

110.    ITC, the IT Group, and their affiliates informed prospective participants that: "Retirement and Termination distributions can be paid out over a period of time (5, 10, or 15 years) . . ." (Exhibit "4," bate stamp 95 (IT Corporation's "DCP Q&A," dated 6/24/97 at 1)).

111.    ITC, the IT Group, and their affiliates informed prospective participants that the Plan:

a.    "[p]rovides an opportunity to defer income from taxation above what the IRS will allow you to contribute to the IT 401(k) [retirement] Plan . . .";

b.    [a]llows payouts from your account prior to your retirement if you so specify or under certain hardship conditions; and

c.    "allows flexibility in receiving payouts at retirement in a lump sum or over 5, 10, and 15 years, with interest being credited on the unpaid balance." (IT Corporation's 11/97 letter to prospective "Associates," a true and correct copy of which is attached as Exhibit "10," bate stamp 157)

112.    Based on information available at the time of filing the instant lawsuit, the Plan is primarily designed, and was actually used by all but three of the Plaintiffs, for the deferral of income until retirement and/or for the deferral of income to periods extending to the termination of covered employment or beyond.

113.    The terms of the Plan do not permit a participant to withdraw some or all of his or her account balance at any time without penalty: participants may withdraw all of their account

balance at any time only subject to a 15% early withdrawal penalty and forfeiture of future

participation in the Plan.

114.    The Plan states that it is subject to ERISA.  (Plan ¶ 13.9 at 19)

115.    The Plan is an employee benefit plan within the meaning of 29 U.S.C. § 1002(3),

covered by Subchapter I of ERISA, unless otherwise excepted by other subsections of ERISA.

116.    The Plan is a "plan, fund or program . . . maintained by an employer" within the

meaning of 29 U.S.C. § 1002(2)(A).

117.    The terms of the Plan provide "retirement income" to employees within the meaning

of 29 U.S.C. § 1002(2)(A).

118.    The terms of the Plan provide for the deferral of income by employees for periods

extending to the termination of covered employment or beyond, within the meaning of 29 U.S.C.

§ 1002(2)(A).

119.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. §

1002(3).

### ITC, the IT Group, IT Corporation, And Affiliates Are Fiduciaries
### Of the Plan and Are Integrally Related to the Plan:

120.    The "Administrator" of the Plan is the Committee per Article 10 of the Plan.

121.    Pursuant to the Plan:

a.    Employees of IT Corporation or the IT Group were members of the

Committee.

b.    Such employees had the discretionary authority over the fiduciary obligation

to comply with the Funding/Exclusive Benefit Obligations.

c.    The President and CEO of IT Corporation is responsible for selecting

employees for membership on the Committee; however, the President and CEO of the IT Group

actually made such selection.  (See, e.g., Exhibit "1," bate stamp 41)

d.    Only employees of ITC, the IT Group, and their affiliates are participants in the Plan.

122.    ITC and the IT Group, and their affiliates, agreed, by and through authorized representatives, to the Funding/Exclusive Benefit Obligations.

123.    Under the Plan, ITC and the IT Group, IT Corporation and their affiliates, as employers:

a.    are responsible for paying amounts owed under the Plan.

b.    are responsible for funding the Plan.

c.    are responsible for transferring assets to a trust.

d.    are responsible for remaining liable to carry out the obligations under the Plan.

e.    are responsible for withholding and remitting FICA and other taxes relating to amounts deferred by Participants in the Plan.

f.    are responsible for periodically providing information for preparation of account statements for Participants.

g.    are responsible for providing, and periodically did provide, its counsel to the Committee to provide advice regarding administration of the Plan.

h.    provided their attorney(s) to the Committee for consultations.

i.    are required to indemnify Committee members.

j.    are required to provide extensive information regarding participants including compensation amounts, date of retirement, date of death, and date of termination of employment, to the Committee.

124.    ITC and the IT Group, IT Corporation and their affiliates created the Plan.

125.    ITC and the IT Group, IT Corporation and their affiliates are the Plan's sponsor.

133

126.    IT Corporation and its subsidiaries are the purported grantors for the Plan's trust.

127.    ITC and the IT Group, by and through their Presidents and CEOs, Anthony DeLuca, Francis Harvey, retained discretionary control, and exercised discretionary control, over the actions of the Committee and the Plan.

128.    ITC and the IT Group, IT Corporation, and their affiliates, are fiduciaries of the Plan.

### Exhaustion of Administrative Remedies:

129.    The only administrative procedures required by Article 10 of the Plan relate to the appeal of the denial of claims, and have no application to a Plan that purportedly has no assets to distribute to participants.

130.    Post-petition, prior to filing the instant lawsuit, counsel for the Debtors informed counsel for the Plaintiffs more than once that the Plan had no assets and that participants should file unsecured proofs of claim against the Debtors' bankruptcy estates.

131.    Subsequently, one of the plaintiffs, Shelley Bookspan, made demand on the remaining member of the Committee employed by the Debtors, Mr. Harry Soose (after receiving authorization from Debtors' counsel to contact Mr. Soose directly).  Ms. Bookspan requested that the Committee, *inter alia*, take steps to locate all Plan assets and pay in full Ms. Bookspan's account.

132.    Such demand was later rejected by Debtors' counsel (not Mr. Soose) who asserted, on behalf of the Committee and Mr. Soose, that the Plan had no assets whatsoever to distribute to plan participants.

133.    Ms. Bookspan attempted to exhaust administrative remedies, but none were available to her, prior to Plaintiffs filing the instant lawsuit.

134.    The plan participants have no administrative remedies that they can pursue.

135.    The remaining participants are excused from exhausting administrative remedies because the Plan does not make any administrative remedies available to them.

### FIRST CLAIM FOR RELIEF[3]

**To Recover Benefits Due Under the Terms of the Plan:**
**29 U.S.C. § 1132(a)(1)(B)**
**(on behalf of each Plaintiff individually against the Plan, IT Corporation,**
**and all affiliates in bankruptcy which are authorized employers)**

136.    Plaintiffs reallege and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 121, inclusive, as though fully set forth herein.

137.    The employer and the Plan are integrally related/closely intertwined.

138.    Each of the Plaintiffs is a participant in the Plan.

139.    Benefits are currently due and owing each Plaintiff under the terms of the Plan.

140.    From October 2001 through the Petition Date, some of the Plaintiffs made demands for payments in full from their account (less an early withdrawal penalty) upon authorized representatives of IT Corporation.  No authorized representative of the Plan ever denied that any Plaintiff is owed benefits under the Plan, or otherwise rejected said demand.

141.    From October 2001 through the Petition Date, each Plaintiff was and is entitled to said benefits.

---

[3] The Debtors' counsel, arguing on behalf of all the Defendants at the hearing held February 26, 2003 (2 pm), regarding the "Defendants' Consolidated Motion to Dismiss the [First] Amended Complaint" (docket #22), represented to the Court that Plaintiffs have an unsecured claim (Tr. 2-26-03 at 29)—which cannot not be the case unless benefits are due and have not been paid (First Claim for Relief), and the Debtors breached the terms of the Plan (Second Claim for Relief).  Plaintiffs reserve the right to assert that the Defendants are judicially-, and/or equitably-estopped from denying that each Plaintiff holds an allowed unsecured claim in the amount of their account balance as calculated in the Prayer for Relief, and that judgment can be promptly entered with respect to the First and Second Claims for Relief.

142.    On the Petition Date each Plaintiff was *de facto* denied the benefits due and owing by the Plan, and has not been paid, because neither the Plan nor any trust held assets due to IT Corporation's failure to perform vis-à-vis the Funding/Exclusive Benefit Obligations and to otherwise contribute sufficient funds to pay the benefits owed.

143.    Administrative remedies have been exhausted as noted *supra*.

## SECOND CLAIM FOR RELIEF

**To Enforce Participants' Rights Under the Terms of the Plan:**
**29 U.S.C. § 1132(a)(1)(B)**
**(on behalf of each Plaintiff individually against IT Corporation**
**and all affiliates in bankruptcy which are authorized employers)**

144.    Plaintiffs reallege and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 129, inclusive, as though fully set forth herein.

145.    If the Court determines that the IT Group, Anthony DeLuca, and Francis Harvey are not fiduciaries pursuant to the terms of the Plan and the Master Trust Agreement per the prior Claim for Relief:

a.    IT Corporation breached the Funding/Exclusive Benefit Obligations by failing to contribute funds to a trust or account for the sole and exclusive benefit of the Plaintiffs once it became clear that IT Corporation was at risk of insolvency and, ultimately, bankruptcy.

b.    IT Corporation breached the Funding/Exclusive Benefit Obligations by failing to pay the benefits to Participants as required by the terms of the Plan.  As a consequence of IT Corporation's acts and omissions, IT Corporation breached the terms of the Plan, damaging Plaintiffs in the amounts claimed below.

///

///

///

30

136

## THIRD CLAIM FOR RELIEF

**Breach of Fiduciary Duties:**
**29 U.S.C. §§ 1082, 1103, 1104, 1105(a), 1109, 1132(a)(2) and (a)(3)(B)**
**(on behalf of the Plan against IT Corporation, the IT Group and their**
**affiliates in bankruptcy, CP II, Francis J. Harvey, Anthony DeLuca, and Harry Soose)**

146.     Plaintiffs reallege and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 131, inclusive, as though fully set forth herein.

147.     The IT Group, is a fiduciary of the Plan.

### Harry Soose Is a Fiduciary

148.     Harry Soose is a fiduciary of the Plan in that:

a.     he was a member of the Committee specifically given discretionary authority and/or responsibility over administration of the plan pursuant to Article 10, ¶ 10.1 of the Plan, from August 16, 1999, to the Petition Date;

b.     as a member, he retained and exercised discretionary control over the Plan, including the payments to be made by the Employers to the Plan pursuant to ¶ 12.1 of the Plan;

c.     as a member, he attended meetings of the Committee regarding administration of the Plan;

d.     as a member, he had "authority and responsibility to interpret and enforce the provisions of the [Plan]."   (Exhibit "4," bate stamp 104 (IT Corporation's "DCP Q&A," dated 6/24/97 at 10)).

### Anthony DeLuca and Francis Harvey are Fiduciaries

149.     Anthony DeLuca and Francis Harvey, during the time each was President and CEO of the IT Group, had the authority and obligation under Article 10 of the Plan: (i) to select, appoint, and retain employees of IT Corporation as members of the Committee; (ii) to ensure that the appointed Committee-member understood his/her obligations, (ii) for oversight vis-à-vis the conduct of the administration of the Plan; (iii) to monitor and periodically review the actions of the

Committee; (iv) to ensure performance of the Committee's obligations and compliance with the terms of the Plan and with ERISA's obligations; (v) to prevent misconduct and/or injury; and (vi) to remove employees of IT Corporation (Plan Article 10, ¶ 10.1 at 14).

150.    Anthony DeLuca and Francis Harvey, during their respective terms as President and CEO, each had discretionary control and exercised discretionary authority over the management and administration of the Plan.

151.    Anthony DeLuca and Francis Harvey, during their respective terms as President and CEO, held and possessed actual authority, and/or assumed authority, whether to perform the Funding/Exclusive Benefit Obligations.

152.    During the time Anthony DeLuca and Francis Harvey were Presidents and CEOs of the IT Group, they were fiduciaries of the Plan.

153.    Anthony DeLuca, and Francis Harvey, as Presidents and CEOs, controlled the actions of each affiliate under the IT Group, umbrella of companies and, accordingly, controlled whether the Employers would make contributions to the Plan pursuant to the terms of the Master Trust Agreement.

154.    By its actions described above, *inter alia*, paragraphs 65 - 68, CP II engaged in "discretionary acts" of plan "management" and "administration," within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and is a fiduciary of the Plan.

**Breach of Fiduciary Duties:**

155.    Harry Soose, as a member of the Committee, knew of should have known that the insolvency of the IT Group, and its affiliates was a particularly critical threat to the Plan's benefits.

156.    Harry Soose, as a member of the Committee, violated his fiduciary duties to administer the Plan in accordance with ERISA by failing to:

a.    cause the transfer of assets to a trust pursuant to the Committee Funding Commitment and the Funding/Exclusive Benefit Obligations, and failing to take reasonable steps to demand that these obligations be complied with, with sufficient lead-time to avoid the risk that such payment could be avoided as a preferential transfer under the Bankruptcy Code, in violation of, *inter alia*, 29 U.S.C. § 1104(a)(1) and ¶ 12.1 of the Plan;

b.    disclose and immediately inform each Plaintiff and participant prior to November 2001 that the IT Group was at risk of insolvency; that insolvency was a particular threat to all Plan benefits; and that they should immediately demand payment in full of the balance of their Plan account and take an immediate distribution of the same, and through inaction or silence materially mislead plan participants and beneficiaries in violation of, *inter alia*, 29 U.S.C. § 1104(a)(1) and Article 10 of the Plan;

c.    disclose in November 2001 that the decision had been made that the IT Group, and its affiliates would not transfer assets to a trust pursuant to the Committee Funding Commitment and the Funding/Exclusive Benefit Obligations, and to immediately inform each Plaintiff/ participant that they should immediately demand payment in full of the balance of their Plan account and take an immediate distribution of the same when the decision was made, and through inaction or silence materially mislead plan participants and beneficiaries in violation of, *inter alia*, 29 U.S.C. § 1104(a)(1) and Article 10 of the Plan;

d.    disclose in November 2001, that the decision had been made that the IT Group, and its affiliates would <u>not</u> transfer assets to a trust pursuant to the Committee Funding Commitment and the Funding/ Exclusive Benefit Obligations, and to immediately inform each Plaintiff/ participant that they should immediately withdraw from the Plan and stop deferring their salaries, and through inaction or silence materially mislead plan participants and beneficiaries in violation of, *inter alia*, 29 U.S.C. § 1104(a)(1) and, *inter alia,* Article 10 of the Plan;

**33**

139

e.    disclose and correct misstatements and misrepresentations, such as the Payment Representations and the New Enrollment Representations made in December 2001 and January 2002, and through inaction or silence materially mislead plan participants and beneficiaries violation of, *inter alia*, 29 U.S.C. § 1104(a)(1) and, *inter alia,* Article 10 of the Plan;

f.    advise the Plan participants of the risks in relying upon the oral promises contained in the Funding/Exclusive Benefit Obligations to protect their pension benefits and/or failing to take reasonable steps to require the IT Group, to so-advise participants, and/or failing to ascertain that such advice was required, in violation of, *inter alia,* 29 U.S.C. § 1104(a)(1) and Article 10 of the Plan;

g.    ensure that the Funding/Exclusive Benefit Obligations were written terms of the Plan, in violation of, *inter alia*, 29 U.S.C. § 1104(a)(1) and Article 10 of the Plan;

h.    ensure that the employers were depositing monies withheld from participants' wages in trust, as required by 29 U.S.C. § 1103;

i.    ensure that the minimum funding obligations of 29 U.S.C. § 1082 *et seq.* were met, and/or failing to take reasonable steps to require that the IT Group comply with this statutory obligation, and/or failing to ascertain whether such minimum funding was required; and

j.    advise the Plan participants of violations of ERISA and of the terms of the Plan, which would have allowed the participants to take steps to enforce their rights; and/or failing to take reasonable steps to require the IT Group, to so-advise participants and/or failing to ascertain that whether such advice was required, in violation of, *inter alia,* 29 U.S.C. § 1104(a)(1) and, *inter alia,* Article 10 of the Plan.

157.    CP II as an entity unilaterally taking/assuming an individual discretionary role over the Plan, violated its fiduciary duty to administer the Plan in accordance with ERISA by failing to:

a.    to cause, and in fact affirmatively prevented, the IT Group, and IT

Corporation from performing and complying with the Committee Funding Commitment and the

Funding/Exclusive Benefit Obligation, and by preventing other fiduciaries from causing the IT

Group, to comply with such obligation, and by failing to take reasonable steps to ensure that the IT

Group, and its affiliates complied with such obligation, in or around November 2001, in violation of

29 U.S.C. § 1104(a)(1).

158.    Anthony DeLuca, Francis Harvey, and the IT Group, and its affiliates including IT

Corporation knew of should have known (a) that the insolvency of the IT Group and its affiliates

was a particularly critical threat to the Plan's benefits; (b) about the deteriorating financial condition

of the IT Group, and its affiliates, and (c) should have, but failed to, meet with Mr. Soose and other

Committee members on a periodic basis to discuss the company's financial condition and,

consequently, withheld such information from Harry Soose as a member of the Committee.

159.    Anthony DeLuca, Francis Harvey, and the IT Group, and its affiliates including IT

Corporation violated their fiduciary duties to administer the Plan in accordance with ERISA by

failing to:

a.    monitor and oversee the actions of the actions of Harry Soose as a member of

the Committee, and of CP II, thus enabling Harry Soose and CP II to commit as co-fiduciaries each

and every breach of duty listed above, in violation of 29 U.S.C. § 1104(a)(1)(A);

b.    monitor and oversee the actions of the actions of Harry Soose as a member of

the Committee, and of CP II, thus enabling Harry Soose and CP II to commit as co-fiduciaries each

and every breach of duty listed above, in violation of 29 U.S.C. § 1105; and

c.    by knowingly participating in all of the foregoing acts and omissions of

Harry Soose and CP II, knowing such acts and omissions constituted a breach, or by knowing about

the acts/omissions of Harry Soose and CP II and doing nothing/making no efforts under the circumstances to remedy the breaches, in violation of 29 U.S.C. § 1105(a);

d.     by withholding material information from Harry Soose as a member of the Committee regarding the true financial condition of the IT Group, and its affiliates, and failure to ensure that Harry Soose was monitoring the financial status of the IT Group, and its affiliates, in violation of 29 U.S.C. § 1105(a); and by failing to

e.     hold Plan assets, the amounts withheld from each Plaintiff's paychecks from January 1, 1996, through the Petition Date, in trust as required by 29 U.S.C. § 1103 for the sole and exclusive benefit of the Participants, and/or failing to take reasonable steps to require the IT Group, and its affiliates comply with this statutory obligation, and/or failing to ascertain that holding Plan assets was required; and

f.     place monies withheld from participants' wages in trust, as required by 29 U.S.C. § 1103.

160.     Defendants' individual and collective fiduciary breaches caused the Plan's losses.

## FOURTH CLAIM FOR RELIEF

**To Obtain Appropriate Equitable Relief for Violations of ERISA:
29 U.S.C. §§ 1103, 1082, 1132(a)(3)(B)
(on behalf of the Plan against IT Corporation, the IT Group
and their affiliates in bankruptcy)**

161.     Plaintiffs reallege and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 146, inclusive, as though fully set forth herein.

162.     IT Corporation and the IT Group, and their affiliates violated their fiduciary obligation to administer the Plan in accordance with ERISA pursuant to 29 U.S.C. §§ 1103 and 1082

36

142

163.    Plaintiffs are entitled to such other appropriate equitable relief for breach of the foregoing statutory provisions, as provided for by 29 U.S.C. § 1132(a)(3)(B).


## FIFTH CLAIM FOR RELIEF

**To Obtain Appropriate Equitable Relief for Violations of the Plan and Trust:
29 U.S.C. § 1132(a)(3)(B)
(on behalf of the Plan and each Plaintiff individually against
IT Corporation, and the IT Group
and their affiliates in bankruptcy)**

164.    Plaintiffs reallege and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 149, inclusive, as though fully set forth herein.

165.    All of the Fiduciaries violated their fiduciary obligation to administer the Plan in accordance with the terms of the Plan.

166.    Plaintiffs are entitled to such other appropriate equitable relief for breach of the terms of the Plan as provided for by 29 U.S.C. § 1132(a)(3)(B).


## SIXTH CLAIM FOR RELIEF

**Intentional/Tortious Interference with Contract:
under Pennsylvania law
(on behalf of each Plaintiff individually against CP II)**

167.    Plaintiffs reallege and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 152, inclusive, as though fully set forth herein.

168.    If CP II is determined not to be a fiduciary of the Plan nor acting as a fiduciary with respect to the actions described herein:

when CP II ordered the IT Group, and IT Corporation not to perform/comply with its contractual obligation to pay certain funds prior to or during November 2001, CP II:

a.    knew a valid contract existed between IT Corporation, the IT Group, and a group of participants; and

b.    knew the IT Group and IT Corporation intended to, was about to, perform with respect to such obligations;

c.    intended to induce the IT Group and IT Corporation not to perform its obligations and use the money retained to further CP II's own financial interests and purposes and, consequently,

d.    intended to harm/damage all of the participants of the Plan including Plaintiffs.

169.    CP II's interference was improper/without justification in that:

a.    the Plan and Plaintiffs had a substantial interest in the payment of such funds; and

b.    CP II's conduct and/or omissions constitutes the direct and proximate cause of breach of the Funding/Exclusive Benefit Provisions and other provisions of the Plan.

170.    As a result of ordering personnel of the IT Group, not to comply with such obligations, the performance of the terms of the contract were actually breached and disrupted, and the Plaintiffs were harmed/damaged in that the IT Group, did not pay such funds and caused Plaintiffs to incur pecuniary losses in an amount not less than $ 2,162,221.


**SEVENTH CLAIM FOR RELIEF**

**Alter Ego Claim for Relief against the IT Group and its debtor-affiliates, and CP II**

**171.**    Plaintiffs realleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 156, inclusive, as though fully set forth herein.

144

**General Allegations**

172.    The IT Group, IT Corporation, and their affiliates, were at all times pertinent herein, including during all of 2001, so grossly undercapitalized that it was unable to meet debts that may reasonably have been expected to arise in the normal course of business, resulting in the filing of the IT Group's bankruptcy petition on January 16, 2002.

173.    CP II, the IT Group, and IT Corporation had common officers and directors.

**Allegations Particular to the IT Group, and its Affiliates**

174.    The IT Group, at all times pertinent herein, held all the common stock of IT Corporation and controlled IT Corporation.

175.    At various times from 1996 through the Petition Date, the IT Group, failed to respect corporate formalities between the IT Group and IT Corporation, and as between the IT Group, IT Corporation and their affiliates, in that:

a.    the operations of the IT Group, and all of its affiliates were collapsed into, and at, the level of IT Corporation in that IT Corporation: (a) controlled all of the finances of each affiliate, (b) collected the accounts receivable of each affiliate, (c) paid the accounts payable of each affiliate, (d) prepared the accounting records of each affiliate;

b.    substantial intercompany transfers were made between and among affiliates and virtually all were not repaid;

c.    substantial intercompany loans were made between and among affiliates for which no promissory notes were issued;

d.    IT Corporation paid the salaries of employees of many affiliates, such as OHM Corporation and Groundwater Technology, Inc., thus failing to properly match income and expenses;

e.    many affiliates, e.g., OHM Corporation, after it was acquired in 1998, entered into contracts in the name of IT Corporation, and not in their own name, but received no equivalent consideration in return;

f.    substantial labor was transferred between affiliates and not repaid; and

g.    the IT Group, and IT Corporation and their affiliates used the same lawyers and accountants, and the same banks;

h.    amounts deferred from each employee/participant's paycheck issued by IT Corporation was retained, held, used by, and tendered to various vendors and creditors of, ITC and the IT Group, and their affiliates.

176.    In other litigation, *IT Corporation v. Motco Site Trust Fund*, Civil Action No. H-91-3532, United States District Court for the Southern District Of Texas, Houston Division, IT Corporation stipulated that it was the alter ego of the IT Group, and its affiliates.

177.    The IT Group improperly held *de-facto* authority to decide whether to fund the Plan, in violation of ¶ 12.1 of the Plan and other plan documents, in disregard of the status of the Committee, and in disregard of the status of the Plan as a separate legal entity.

178.    Disregard of the separate legal status of the IT Group, and its affiliates is appropriate because extreme injustice will be visited upon the Plaintiffs if their separate legal status is upheld.

179.    As to the First-, Second-, Third-, Fourth-, and Fifth- Claims for Relief asserting liability against IT Corporation, the IT Group, and its affiliates in bankruptcy were at all times the alter-egos of IT Corporation and are liable to Plaintiffs on the same basis.

**Allegations Particular to CP II**

180.    Per Form 13D filed by the Purchasers and the Affiliate with the SEC on or about November 20, 1996, a true and correct copy of the pertinent pages of which are attached at Exhibit "11" and whose terms are incorporated herein in their entirety:

      a.      CP II and the remaining Purchasers and the Affiliate (sometimes referred to as the "Reporting Persons") bought preferred stock of IT Group convertible into common stock and warrants to purchase common stock.  (Exhibit "11" bate stamp 160, 161, 162, 164-65)

      b.      CP II and the remaining Purchasers and the Affiliate paid aggregate consideration of $49,692,417.  (Exhibit "11" bate stamp 161-62)  CP II and the Purchasers acquired warrants to purchase 1,119,662 shares of common stock of IT Group (Exhibit "11" bate stamp 165), and preferred stock convertible into 5,038,500 shares of common stock of IT Group.  (Exhibit "11" bate stamp 165)

      c.      For five years after consummation of the purchase of preferred stock and warrants, and so long as the Purchasers and the Affiliate continued to hold 20% of the aggregate voting power of the IT Group, the holders of the Preferred Stock, voting as a separate class, were entitled to elect a majority of the Company's Board of Directors.  (Exhibit "11" bate stamp 162-63)

181.    CP II and the remaining Purchasers acquired additional common stock and preferred stock convertible into common stock of the IT Group between January 15, 1998, and August 3, 2000.

182.    Per SEC Form 13D, Amendment No. 5, filed by the Reporting Persons (including CP II) with the SEC on or about August 3, 2000, a true and correct copy of the pertinent pages of which are attached hereto as Exhibit "12," and whose terms are incorporated herein in their entirety:

      a.      CP II and the Purchasers owned 959,230 shares of common stock of the IT Group  (Exhibit "12" bate stamp 195);

      b.      CP II and the Purchasers owned preferred stock of the IT Group that could be converted into 5,436,399 shares of common stock of IT Group  (Exhibit "12" bate stamp 195);

      c.      CP II and the Purchasers owned warrants to purchase 1,119,662 shares of common stock of the IT Group (Exhibit "12" bate stamp 195);

d.    accordingly, CP II and the Purchasers acquired and are the beneficial owners of 7,515,291 shares of common stock of the IT Group;

e.    the total outstanding shares of IT Group are 22,906,502, plus the conversion of all Preferred Stock and Warrants deemed beneficially owned by all the reporting persons, or 7,515,291, for a total of 30,421,793 outstanding shares beneficially owned (Exhibit "12" bate stamp 197);

f.    the estimated percentage of common stock of IT Group beneficially owned by the Purchasers was estimated to be 24.7 % (7,515,291 / 30,421,793) or 24.8 % (Exhibit "12"; bate stamp 196-97);

g.    the estimated percentage of common stock of IT Group beneficially owned by the general partner/managing general partner (TC Grp) was estimated to be 25.6% (3.3% + 18.5% + 3.8%) (Exhibit "12"; bate stamp 196-97).

h.    CP II was the second largest holder of common stock, warrants to buy common stock, and preferred stock convertible into common stock of IT Group (Exhibit "12" bate stamp 196).

183.    At all times pertinent herein, CP II and the remaining Purchasers beneficially owned an amount of the common stock of IT Group, preferred-stock convertible into IT Group common stock, and warrants to purchase common stock of IT Group, sufficient to permit them to elect a majority of the IT Group's Board of Directors.

184.    At all times pertinent herein, CP II and the remaining Purchasers did in fact elect at least a majority of the Board of Directors.

185.    CP II and the remaining Purchasers each have as a general partner or managing general partner TC Group, L.L.C. ("TC Grp")

186.    A managing member of TC Grp is TCG Holdings, L.L.C. ("TCG").

42

187.    The Purchasers executed three voting agreements between themselves on or around November 20, 1996 (the "Voting Agreement(s)").  A true and correct copy of the voting agreements is attached hereto as Exhibit "13," originally an exhibit to Form 13D filed with the SEC on or about November 20, 1996, by each of the Purchasers and the Affiliate, and whose terms are incorporated herein in their entirety.

188.    CP II is the lead limited partnership listed in each of the Voting Agreements.

189.    Daniel A. D'Aniello, as the Managing Director of TCG, executed all three (3) Voting Agreements by and on behalf of CP II and each of the eight remaining Purchasers.  (Exhibit "13" bate stamp 203)

190.    Pursuant to the Voting Agreements, each and every Purchaser agreed that:

a.    CP II, CP III, and CITP had the right to designate as nominee for election to the Board of Directors of IT Group one director (that the Purchasers are entitled to elect as holders of Preferred stock) (See, e.g., Exhibit "13" bate stamp 204, 205-06);

b.    the Purchasers further agreed to elect each such designated person to the IT Group's Board of Directors (See, e.g., Exhibit "13" bate stamp 204, 205-06).

191.    For the five year period prior to and including November 2001, the Purchasers including CP II, collectively nominated/elected at least a majority of the Board of Directors of the IT Group and, consequently, controlled the IT Group and its affiliates.

192.    Francis B. Barker and Philip B. Dolan were and are at all relevant times herein Managing Directors for CP II and CP III.  A true and correct copy of pertinent pages of the Carlyle Group's web site, printed on June 21, 2002, is attached hereto as Exhibit "14" (bate stamp 223) and whose terms are incorporated herein in their entirety.

193.    In the several months prior to IT Group and its affiliates filing for bankruptcy, Mr. Barker and Mr. Dolan, and other personnel from related investment funds or affiliates, were often

43

149

physically present at the business premises of IT Group in Monroeville, PA, and were also present by phone.

194.    In the several months prior to the IT Group and its affiliates filing bankruptcy, Mr. Barker and Mr. Dolan held numerous closed-door meetings in person and by phone during which they would make decisions regarding the operations of the IT Group and its affiliates including determining how much cash CP II was willing to make available to the operations of the IT Group and its affiliates and their various business lines, including the vendors/creditors of each of the business lines.

195.    Mr. Barker occasionally sought information from, among others, Jim Price, Gary Gardner, Enzo Zoratto, Ben Kosek, and Dennis Galligan, but often would consult only with Mr. Dolan and not consult with officers or representatives of the IT Group and its affiliates in making business decisions on behalf of the IT Group and its affiliates.

196.    Mr Barker made decisions regarding whether and how much funds from the operations of IT Group and its affiliates would be made available regarding requests for payment for various vendors/creditors of the IT Group and its affiliates.  For example, Mr. Barker would state that only a few hundred thousand dollars were available from the revenues of the IT Group and its affiliates to pay a list of requests for payment for vendors and creditors totaling over a million dollars.

197.    Mr. Barker set the criteria regarding which vendors and creditors would be paid and which would not including, for example, only allowing payment to a vendor or creditor if the payment would generate future billings/invoices to provide revenue to the IT Group's operations.

198.    Lists of requests for payment to various vendors were presented to Mr. Barker for review and approval.

199.    CP II made the decision not to fund any portion of the obligations owed by IT Group and IT Corporation and their affiliates to the Plan and informed various personnel of the same.

200.    CP II made the decision not to fund any portion of the obligations owed by IT Group and IT Corporation and their affiliates to the Plan by, *inter alia*, establishing the foregoing criteria for determining which vendors/creditors would be paid and which would not.

201.    CP II's status as one of the largest holders of common stock, preferred stock convertible to common stock, and warrants to purchase common stock of IT Group, as the largest domestic investment fund holding stock in the IT Group, the lead investment fund vis-à-vis the Voting Agreements, the election of a majority of the Board of Directors by CP II and the remaining Purchasers at all times relevant herein, the physical presence of Messrs. Barker, Dolan, and other individuals associated with the Carlyle Group, at the IT Group's headquarters, and CP II's assertion of control over use of all of the cash generated from the operations of the IT Group and its affiliates, lead officers and personnel of IT Group and IT Corporation to conclude that CP II had taken control of the operations of IT Group and its affiliates.

202.    In the several months prior to the IT Group and its affiliates filing bankruptcy, CP II took and assumed control and authority over various aspects of the operations of IT Group and its affiliates including over senior management functions, making decisions rightfully those of management thus usurping the role of management, and making decisions going beyond providing guidance regarding the strategic direction of the company, under the pretext of a business consulting agreement.

203.    IT Group held all the stock of IT Corporation and its affiliates and controlled IT Corporation.

204.    CP II improperly assumed authority to decide whether to fund the Plan in violation of ¶ 12.1 of the Plan and other plan documents, and in disregard of the status of both the IT Group,

and IT Corporation as separate legal entities, and in disregard of the status of the Plan as a separate legal entity.

205.    Disregard of CP II's separate legal status is appropriate because extreme injustice will be visited upon the Plaintiffs if CP II's separate legal status is upheld.

206.    Plaintiffs are informed and believe that substantial dividends were paid, and intergroup transfers were made, to CP II, the remaining Purchasers, and the Affiliate on account of the preferred and common stock held by such parties.

207.    As to the First-, Second-, Third-, Fourth-, and Fifth Claims for Relief asserting liability against IT Corporation, CP II was at all times the alter-ego of the IT Group, IT Corporation, and its affiliates and is liable to Plaintiffs on the same basis.

### EIGHTH CLAIM FOR RELIEF

**Pennsylvania Wage Payment and Collection Law**
**43 Pa. Cons. Stat. Ann. §§ 260.1 to 260.11**
**(on behalf of each Plaintiff individually against IT Corporation,**
**Anthony DeLuca, and Francis Harvey)**

208.    Plaintiffs realleges and incorporates herein by this reference each and every allegation set forth in paragraphs 1 through 171, inclusive, as though fully set forth herein.

209.    IT Corporation is headquartered in Pennsylvania.

210.    IT Corporation's parent, the IT Group, is headquartered in Pennsylvania.

211.    Both IT Corporation and the IT Group, employed persons in Pennsylvania at all times pertinent herein, and continues to do so today.

212.    IT Corporation was and is an employers as defined by 43 P.S. § 260.2a.

213.    The Plaintiffs were employed by IT Corporation during the time period 1996-2001. During such time period four plaintiffs lived, and currently live, in Pennsylvania.  The remaining plaintiffs now reside throughout the United States.

46

214.    The Plaintiffs are employees within the meaning of the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1.

215.    Plaintiffs are owed wages/salary, bonuses, and interest on the same (collectively, "wages and other benefits").

216.    Wages and other benefits are owed for the period from January 1, 1996 – December 31, 2001; Defendants are jointly and severally liable for the same.

**RELIEF REQUESTED**

**WHEREFORE** Plaintiffs prays for judgment against Defendants as follows:

1.    On the First and Second Claims for Relief:

for entry of judgment on behalf of each Plaintiff individually:

    a.    to recover benefits due each Plaintiff under the terms of the Plan, to enforce each Plaintiff's rights under the terms of the Plan, and/or to clarify each Plaintiff's rights to future benefits under the terms of the Plan;

2.    On the Third Claim for Relief:

for entry of judgment on behalf of the Plan:

    a.    that each defendant is a fiduciary with respect to the Plan, that each defendant has breached the responsibilities, obligations, and or duties imposed upon fiduciaries by Title 29 U.S.C., Chapter 18, Subchapter I, and that each defendant is personally liable to make good to the Plan any and all losses to the Plan resulting from their respective breaches, and that each defendant is liable to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and that each defendant shall be subject to such other equitable or remedial relief as the Court may deem appropriate, including monetary relief and/or the removal of such fiduciary;

3.    On the Fourth Claim for Relief:

47

for entry of judgment on behalf of the Plan:

       b.     to obtain other appropriate equitable relief to enforce any provisions of Title 29 U.S.C., Chapter 18, Subchapter I;

       b.     imposition of a lien pursuant to 29 U.S.C. § 1082(f)(1)–(4) on all property of each and every Debtor which filed for bankruptcy protection, whether real or personal, as members of a controlled group of corporations, in the amount of aggregate unpaid installments/payments due the Plan from 1996 – 2001;

       c.     a determination that the amount with respect to which a lien is imposed shall be treated as taxes due and owing the United States pursuant to 29 U.S.C. § 1082(f)(4)(C); and

       d.     a determination that the amount with respect to which a lien is imposed shall be afforded a first priority under the Bankruptcy Code, 11 U.S.C. § 503(b)(1)(B);

    4.     On the Fifth Claim for Relief:

for entry of judgment on behalf of the Plan and each Plaintiff individually:

       a.     to obtain other appropriate equitable relief to enforce any provisions of the terms of the Plan;

    5.     On the Sixth Claim for Relief:

for entry of judgment on behalf of each Plaintiff individually:

       a.     that CP II tortiously and wrongfully interfered and caused IT Corporation to breach its contractual obligations to perform vis-à-vis the Funding/Exclusive Benefit Obligations, and is liable to each Plaintiff in the amount of his or her unpaid account balances, the aggregate of which is not less than $ 2,162,221;

    6.     On the Seventh Claim for Relief:

for entry of judgment that CP II is liable to the Plaintiffs on the same basis as is IT Corporation, as stated in the First-, Second-, and Third Claims for Relief.

7.    On the Eighth Claim for Relief:

for entry of judgment on behalf of each Plaintiff individually:

a.    that IT Corporation, Anthony DeLuca, and Francis Harvey are liable for unpaid wages, fringe benefits and wage supplements, the aggregate of which is not less than $ 2,162,221, including liquidated damages in an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars, whichever is greater.

8.    On all Claims For Relief;

a.    for pre-judgment interest;

b.    for post-judgment interest pursuant to 28 U.S.C. § 1961(a);

c.    for costs of suit;

d.    for attorneys' fees according to proof pursuant to 29 U.S.C. § 1132(g), and pursuant to the Plan ¶ 13.16 at 20 (1996), and D.Del. L.R. 54.3; and

E.    for such other, further and additional relief as the Court deems just and proper under the circumstances.

Dated: March 12, 2003                LAW OFFICES OF THOMAS A. JOHNSON

/s/ Thomas A. Johnson
By: _____
    Thomas A. Johnson (Cal. Bar No. 158270)
33 West Mission Street, Suite 201
Santa Barbara, California 93101
Telephone: (805) 682-2600
Facsimile: (805) 682-2333
Attorney for Plaintiffs


/s/ John Stull                    .
By: _____
John M. Stull (Bar # 568)
1300 N. Market Street
Wilmington, DE 19899-1947
(302) 654-0399
Attorneys for Plaintiffs