EXHIBIT "8"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| THE IT GROUP, INC., et al., | ) | Case No. 02-10118 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ———————————— | ) | |
| | ) | |
| THE IT GROUP, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 02-4756 (MFW) |
| | ) | |
| ROCHELLE BOOKSPAN, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————— | ) | |
| | ) | |
| JOHN ACCARDI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 02-5486 (MFW) |
| | ) | |
| IT CORPORATION, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————— | ) | |

**OPINION**[1]

Before the Court are the Defendants'[2] Renewed Motions to

---

[1] This Opinion Constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2] The Defendants are the IT Group, Inc., and affiliates (collectively "the Debtors"), three officers of the Debtors, and Carlyle Partners II, L.P. ("Carlyle"), as the Debtors' alleged alter ego. Carlyle filed a separate Motion to dismiss for failure to state a claim that it is the Debtors' alter ego. Since we grant the Defendants' joint motion to dismiss, we need

Dismiss the Accardi Complaint and the Bookspan counterclaims.
The Motions seek a determination that the IT Corporation's
Deferred Compensation Plan is an unfunded "top hat" plan.   In
their response to the Motions, the Accardi Plaintiffs[3] and
Bookspan request partial summary judgment and a determination
that the Deferred Compensation Plan is "funded."   For the reasons
set forth below, we grant the Defendants' Renewed Motions to
Dismiss.

I.    <u>BACKGROUND</u>

On January 16, 2002, the Debtors filed voluntary petitions
under chapter 11 of the Bankruptcy Code.   Previously, on July 5
1995, IT Corporation had established the Deferred Compensation
Plan, which was offered to certain eligible management employees,
including the Accardi Plaintiffs.

Shortly before the chapter 11 petitions were filed by the
Debtors, Rochelle Bookspan had filed an action in California
seeking funds allegedly due to her under the terms of the

---

not decide the Carlyle motion.

[3]   The Accardi Plaintiffs are:   John Accardi, David L.
Backus, Rochelle Bookspan, Melissa L. Dubinsky, Dennis G. Fenn,
John P. Franz, William A. Gauntt, Thomas W. Grimshaw, David W.
Hickman, Warren C. Houseman, Stephen C. Kenney, James R. Mahoney,
Thomas R. Marti, David W. Mayfield, William H. McIntosh, Roy
McKinney, David C. McMurtry, Dan Melchior, Georgeann N. Morekas,
William C. Paris, Matthew G. Radek, Kevin Smith, Lou Stout,
Leonard Yamamoto, John E. Foley, James M. Redwine, Stewart
Bornhoft, Enzo Zoratto, and Polly Quick.

Deferred Compensation Plan.  Shortly after the petitions were filed, the Debtors filed a Motion seeking authority to sell substantially all their assets to the Shaw Group, Inc.  Ms. Bookspan filed an objection to the sale which was resolved by the Debtors' agreement to segregate $500,000 of the sale proceeds until it could be determined whether Bookspan was entitled to any funds from the Deferred Compensation Plan.  Subsequently, the Debtors filed an adversary proceeding against Ms. Bookspan seeking a declaration that the Deferred Compensation Plan was unfunded, that any sums due to her were general unsecured claims, and that the escrow should be released.  Bookspan filed a counterclaim asserting her entitlement to the escrowed funds.

In the interim, the Accardi Plaintiffs (including Ms. Bookspan) filed an adversary complaint seeking a declaration that the Deferred Compensation Plan was funded and that they were entitled to the funds in the Plan.  The Defendants filed a Partial Motion to Dismiss the Accardi adversary which was denied with the requirement that the Accardi Plaintiffs file an amended complaint clarifying the factual basis for certain alleged oral promises to fund the Deferred Compensation Plan, the nature of the group of employees that participated in the Deferred Compensation Plan, and the allegations of alter-ego that would warrant piercing the corporate veil.

The Accardi Plaintiffs filed the Second Amended Complaint on

3

March 12, 2003.  The Defendants filed the Renewed Motions to

Dismiss the Accardi Complaint and the Bookspan counterclaim on

March 27, 2003.  At the hearings on the Renewed Motions held on

May 6, 2003, the parties agreed to consolidate the Motions for

determination.  The parties have fully briefed the issues.


II.  <u>JURISDICTION</u>

This Court has jurisdiction over these adversary proceedings

as core proceedings pursuant to 28 U.S.C. §§ 1334(b) & (e) and

157(b)(2)(A), (C), & (O).


III.  <u>DISCUSSION</u>

A.  <u>Top Hat Plan</u>

The Defendants seek dismissal of Bookspan's counterclaim and

the Second Amended Complaint to the extent that both seek a

declaration that the Accardi Plaintiffs are entitled to payment

of funds due them under the Deferred Compensation Plan.  The

threshold issue raised by the Renewed Motions to Dismiss is

whether the Deferred Compensation Plan fits the "top hat"

exclusion of ERISA.

Courts have generally taken an expansive view of the

applicability of ERISA to deferred compensation plans.  <u>See,</u>

<u>e.g.</u>, <u>Duggan v. Hobbs</u>, 99 F.3d 307 (9th Cir. 1996).  As a result,

all deferred compensation plans are covered by ERISA.  29 U.S.C.

§ 1002(2)(A)(ii); <u>Kemmerer v. ICI Americas, Inc.</u>, 70 F.3d 281, 286 (3d Cir. 1995); <u>Miller v. Eichelay Eng'rs, Inc.</u>, 886 F.2d 30, 33 n.7 (3d Cir. 1989).  In this case, it is undisputed that the Deferred Compensation Plan falls within the ambit of ERISA.

However, the Accardi Plaintiffs assert that the Deferred Compensation Plan is a funded plan.  This is significant because ERISA treats funded plans as trusts which are excluded from a debtor employer's bankruptcy estate under section 541(c)(2). <u>See, e.g.</u>, <u>Patterson v. Shumate</u>, 504 U.S. 753, 758 (1992).

There is an exception, however, to this ERISA exclusion. "Top hat" plans are a special breed of ERISA plans that are excluded from the substantive portions of ERISA.  29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  If a plan fits the "top hat" exclusion, ERISA does not impose a trust on the plan's funds. Consequently, section 541(c)(2) would not exclude the property in a "top hat" plan from a debtor employer's bankruptcy estate.

The "top hat" exclusion applies to a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2).  The burden of establishing that a plan fits the "top hat" exclusion is on the party asserting that it is a "top hat" plan.  <u>See, e.g.</u> <u>Carrabba v. Randalls Food Mkts., Inc.</u>, 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999).

<div align="center">5</div>

In this case, it is undisputed that the Debtors maintained the Deferred Compensation Plan primarily for the purpose of providing deferred compensation.  The parties' dispute, however, is whether the Plan is "unfunded" and whether the Plan participants are a "select group of management or highly compensated employees."

<p style="margin-left:2em">1.    <u>The Deferred Compensation Plan Is Unfunded</u></p>

Regarding the first element, "any determination of the 'unfunded' status of a 'top hat' . . . plan of deferred compensation requires an examination of the surrounding facts and circumstances, including the status of the plan under non-ERISA law."  <u>Miller v. Heller</u>, 915 F. Supp. 651, 658 (S.D.N.Y. 1996).

The "essential feature" of a funded deferred compensation plan is that its assets are "segregated" from the employer's "general assets" and are not "available to general creditors if the employer becomes insolvent."  <u>Id.</u> at 657.  <u>Compare</u> <u>Dependahl v. Falstaff Brewing Corp.</u>, 653 F.2d 1208 (8th Cir. 1981) (finding an excess benefit plan was "funded" because the plan documents stated that the employer had secured its obligations by purchasing life insurance and had not reserved its rights to treat the policies as general unrestricted assets) <u>with</u> <u>Belsky v. First Nat'l Life Ins. Co.</u>, 818 F.2d 661, (8th Cir. 1987) (distinguishing <u>Dependahl</u> by noting that the employer reserved its right to use the policies as general assets).  "A plan is

<p style="text-align:center">6</p>

funded when benefits are paid through a specific insurance policy and unfunded when they are paid from the employer's general assets." <u>Belsky</u>, 818 F.2d at 664.

<div align="center">a.    <u>Plan language</u></div>

In this case, the recitals of the Deferred Compensation Plan track the ERISA definition of a "top-hat" plan:

> The purpose of this Plan is to provide specified benefits to non-employee directors and a select group of management or highly compensated employees who contribute materially to the continued growth, development, and future business success of [the Debtors]. The Plan constitutes an unfunded plan that is not qualified under [Internal Revenue Code] Section 401(a).

(Deferred Compensation Plan at ¶ 1.)

Further, the Deferred Compensation Plan recites that it was unfunded and future payments to participants were to be made from the general, unrestricted assets of the Debtor:

> Participants and their Beneficiaries, heirs, successors and assigns shall have no legal or equitable right, interest or claim in any property or assets of an Employer. Any and all of an Employer's assets shall be, and remain, the general, unpledged and unrestricted assets of the Employer. An Employer's obligation under the Plan shall be merely that of an unfunded and unsecured promise to pay money in the future.

(Deferred Compensation Plan at ¶ 13.1.)

The Accardi Plaintiffs assert, however, that the Deferred Compensation Plan is a funded plan because a Trust was created for them. The Accardi Plaintiffs refer to the Master Trust

<div align="center">7</div>

Agreement which was specifically incorporated into the Deferred
Compensation Plan.  (Deferred Compensation Plan at ¶ 12.2.)
However, the Master Trust Agreement itself does not provide for
the creation of a true trust; instead, it provides that the
assets placed in the Trust are general assets of the Debtors
subject to the claims of the unsecured creditors:

> [T]he principal of the Trust, and any
> earnings thereon, shall be held separate and
> apart from other funds of the Company and the
> Subsidiaries and shall be used exclusively
> for the uses and purposes of the Participants
> and general creditors of the Company and the
> Subsidiaries as herein set forth.  The
> Participants and their Beneficiaries shall
> have no preferred claim on, or any beneficial
> ownership interest in, any assets of the
> Trust.  Any rights created under the Plans
> and this Master Trust Agreement shall be mere
> unsecured contractual rights of the
> Participants and their Beneficiaries against
> the Company and the Subsidiaries.  Any assets
> held by the Trust will be subject to the
> claims of the Company's and the Subsidiaries'
> general creditors under federal and state law
> in the event of Insolvency.

(Master Trust Agreement at ¶ 1.3.)

Consequently, based on the plain language of the Deferred
Compensation Plan and the Master Trust Agreement, we conclude
that the Deferred Compensation Plan was an unfunded plan.

> b.    Deduction of compensation

The Accardi Plaintiffs argue, however, that the Deferred
Compensation Plan was, in fact, funded because the Debtors
physically deducted funds from the Plaintiffs' compensation and

8

kept records of the amounts accrued in the Deferred Compensation
Plan.  This argument is not persuasive.  The mere deduction of
compensation from the employees does not render the Plan funded
under ERISA.  See, e.g., Kemmerer, 70 F.3d at 284 (finding a "top
hat" plan unfunded despite the employer's use of "shadow" or
"tracking" accounts to identify compensation which was deferred).
In fact, buying or investing in accounts or funds does not
necessarily defeat the unfunded status of a plan.  See, e.g.,
Demery v. Extebank Deferred Comp. Plan, 216 F.3d 283, 287 (2d
Cir. 2000) (plan was "top hat" because the benefit account, while
separate, was designated as "general assets" of the employer and
the benefit was described as an "unfunded and unsecured promise
to pay in the future"); Darden v. Nationwide Mut. Ins. Co., 717
F. Supp. 388 (E.D.N.C. 1989) (the existence of a separate account
and its use to pay pension liabilities did not make a pension
plan "funded" since the funds were "unrestricted" and able to be
used for "general corporate purposes"), aff'd, 922 F.2d 203 (4th
Cir. 1991), rev'd on other grounds, 503 U.S. 318 (1992).
Consequently, we conclude that the fact that the Debtors deducted
funds from the Accardi Plaintiffs' compensation and maintained an
accounting system to record these amounts is insufficient to
create a "funded" plan.

> c.   No funds were deposited

Furthermore, in this case, it is undisputed that no funds

9

were actually segregated in the Trust.  At no time were funds or
assets transferred to the Trust; nor were assets purchased with
the amounts designated as deferred compensation.  The Accardi
Plaintiffs argue, nonetheless, that the existence of a right to
payment under the terms of the Deferred Compensation Plan created
a funded plan.  For example, a participant could accept payment
of the account balance in a lump sum or in equal payments over
60, 90 or 180 months.  (Deferred Compensation Plan at ¶ 5.9.)

     We find this argument unconvincing.  The Deferred
Compensation Plan expressly provided that any account balance in
the Plan was "a bookkeeping entry only." (Deferred Compensation
Plan at ¶ 1.1)  Until the participant made the election, and was
actually paid, the Deferred Compensation Plan assets remained the
general assets of the Debtors.  Just as a trade creditor has a
right to payment on an invoice, so too did the Plan participants
have a general unsecured claim against the Debtors.  There is
nothing in the Deferred Compensation Plan or the tracking account
statements that created any right of the Plan participants in
specific assets of the Debtors.

               d.    Tax treatment

     The tax treatment of the Deferred Compensation Plan also
supports the conclusion that it was unfunded.  In Kemmerer, the
Third Circuit noted that deferred compensation plans are used to
reduce a participant's taxable income in the present year.  70

                            10

170

F.3d at 286 ("Top hat plans . . . largely exist as devices to defer taxes").

In this case, no tax was withheld or paid by the Plan Participants on the deferred compensation. The Deferred Compensation Plan's terms mirrored the language required under the Internal Revenue Code to obtain and maintain tax-deferred status. See 26 U.S.C. § 457(b)(6) (funds "must remain (until made available to the participant or other beneficiary) solely the property . . . of the employer . . . subject only to the claims of the employer's general creditors").

The Accardi Plaintiffs argue, however, that there were no tax benefits for them because there was no compensation paid at all. This argument misses the mark entirely. The lack of compensation in the given period is precisely what provides the tax benefit for the participant. By deferring payment of compensation, the tax liability for that deferred amount is also deferred. This benefit is not without risk, however, because to qualify for such treatment, the deferred amount must be subject to general unsecured creditors' claims. Otherwise, the "deferred" amount would not be deferred compensation at all and the participant would owe income tax in the current period. That the company might not survive is part of the financial risk taken to reap the tax benefit. As a result, the intended (and actual) tax treatment of the Deferred Compensation Plan bolsters our

11

conclusion that it was an unfunded plan.

>       2.    Select Group of High Level Employees

The Defendants also assert that the Deferred Compensation Plan participants were a "select group of management or highly compensated employees." The Accardi Plaintiffs dispute this.

The Deferred Compensation Plan documents track the ERISA language with respect to this element of the "top hat" exclusion:

> Participation in the Plan shall be limited to non-employee directors and to employees of an Employer who are part of a select group of management or highly compensated employees. Generally, in the case of employees, such group shall be limited to employees eligible to participate in the Company's bonus incentive plan and with a Base Annual Salary of at least $100,000. From the foregoing, the Committee shall select, in its sole and absolute discretion, employees to participate in the Plan.

(Deferred Compensation Plan at ¶ 2.1.) The plain language of the Deferred Compensation Plan leaves little room for the Accardi Plaintiffs to prevail.

To satisfy the requirement that a "top hat" plan be restricted to a "select group of management or highly compensated employees," the standard must be met both quantitatively and qualitatively. Senior Executive Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 148 (3d Cir. 1996) ("In number, the plan must cover relatively few employees. In character, the plan must cover only high level employees").

a.    Quantitative test

With respect to the quantitative "select group" restriction, the highest percentage of employees covered by a plan found to have been a "top hat" plan, while not a bright line test, has been 15%. Demery, 216 F.3d at 283. In this case, the Accardi Plaintiffs submitted no proof that the Deferred Compensation Plan covered more than a "select group" of employees despite the opportunity to amend their complaint. Since the Accardi Plaintiffs bear the burden of asserting any facts that may support their position, which was not met, we conclude that the Plan meets the quantitative "select group" analysis.

b.    Qualitative test

With respect to the qualitative character, the deferred compensation plan participants must all be "high level" employees, either "management" or "highly compensated." New Valley, 89 F.3d at 148. In this case, the Deferred Compensation Plan states that to be eligible an employee must participate in the Bonus program, have a salary in excess of $100,000, and be selected by the Deferred Compensation Committee.

i.    Management employees

The Accardi Plaintiffs argue that several of the Plan participants were not "executive" level employees who could bind the Debtors. This argument is not persuasive. "Executive" level seniority is not required; "management" level is sufficient. In

13

this case, the Accardi Plaintiffs were all "manager" level or higher.  In fact, the salary sheet attached to the complaint lists the lowest ranking grade as "E10: Human Resource Manager II."  (Second Amended Complaint, Exhibit 8.)  Nearly all of the jobs listed on the salary sheet contain the title "Manager," "Director," or "Controller."  (Id.)

The Second Amended Complaint alleged no basis for concluding that the Deferred Compensation Plan covers anything other than management level employees.  Accordingly, we conclude that there is no genuine issue of material fact and hold that the Deferred Compensation Plan satisfies the "management" requirement for a "top hat" plan.

### ii.  Highly compensated

Nor is there a genuine issue of material fact regarding whether the Deferred Compensation Plan satisfies the "highly compensated" criteria of the "top hat" exclusion.  In addition to the Deferred Compensation Plan language which expressly provides that the Plan covers highly compensated employees, each of the Plan participants earned salaries in excess of $100,000 per year. We conclude that this satisfies the "highly compensated" criteria for a "top hat" plan.

While the test requires satisfaction of either the "management" or "highly compensated" employees standard, we conclude that the Deferred Compensation Plan meets both elements

14

of the "top hat" exclusion.  Accordingly, we find that the Deferred Compensation Plan is excluded from ERISA's substantive requirements as a matter of law.

### 3.    Oral Representation to Plaintiff Mahoney

The Accardi Plaintiffs assert, however, that an oral representation to one of them establishes that the Deferred Compensation Plan was a funded Plan.  Specifically, they argue that the President and CEO of IT Corporation made an oral representation to one of the Plaintiffs, Dr. James Mahoney, that, in the event of the Debtors' insolvency, the Trust would be funded and the amounts owed to participants would be paid in full.  The Accardi Plaintiffs argue that such an oral representation was made a part of the Deferred Compensation Plan and gave rise to a funding obligation on the part of the Debtors.

### a.    Parol evidence

If the Deferred Compensation Plan was ambiguous, parol evidence such as the oral representation to Dr. Mahoney could be admitted to resolve the ambiguities.  To determine whether parol evidence is admissible, we must determine whether an ambiguity exists in the Deferred Compensation Plan.  New Valley, 89 F.3d at 149-50.

In New Valley, the Third Circuit held that a court "cannot interpret words in a vacuum, but rather must carefully consider the parties' context."  Id. at 149.  The Third Circuit has

15

specifically denounced the "four corners" approach to contract interpretation when determining whether ambiguities exist. Id. at 150. Extrinsic evidence should be considered to determine whether an ambiguity exists. Id. at 149. Courts should consider "the proffer of the parties and determine if there are objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." Id. at 150 (citations omitted). The court should also review the meanings of the contract language suggested by both sides and the evidence offered to support the interpretations. Id. Possible extrinsic evidence includes the contract's structure, the parties' bargaining history, and an individual's conduct that reflects the interpretation of the contract. Id.

In this case, the oral representation would add an additional term to the contract regarding funding; it would not shed light on the written terms of the Plan. Thus, we conclude that it does not suggest any ambiguity in the clear and very precise language of the Deferred Compensation Plan and there is no objective indicia that the terms of the Deferred Compensation Plan, as written, are susceptible to different meanings. The Deferred Compensation Plan is not ambiguous, no extrinsic evidence is necessary to resolve any ambiguity, and the Deferred Compensation Plan documents control.

16

176

b.    <u>Integration clause</u>

The Defendants argue further that, even if such an oral representation was made (which they dispute), it could not be considered an oral modification of the Deferred Compensation Plan given the unequivocal merger clause in the Annual Plan Agreement:

> This Agreement contains the entire understanding between parties with respect to the subject matter hereof and supersedes any prior understanding and agreements with respect thereto.

(Annual Plan Agreement at ¶ 7.)   The Annual Plan Agreement incorporates the Deferred Compensation Plan and its terms:

> The Plan Document, a copy of which has been delivered to the Participant, is hereby incorporated into and made a part of this Agreement as though set forth in full in this Agreement and <u>vice versa</u>.   The parties to this Agreement agree to and shall be bound by, and have the benefit of, each and every provision of the Plan as set forth in the Plan Document.   This Agreement and the Plan Document, collectively, shall be considered one complete contract between the parties. The Employee [sic] shall be responsible for all of the Participant's benefit under the Plan.

(Annual Plan Agreement at ¶ 2.)

The Accardi Plaintiffs argue, however, that "top hat" plans, in contrast to ERISA plans, do not have a writing requirement. They argue, therefore, that the lack of a writing requirement in "top hat" plans means that the Deferred Compensation Plan cannot be integrated and that oral modifications must be considered. <u>Cf.</u> <u>New Valley</u>, 89 F.3d at 149 (ERISA's writing requirement for

17

non "top hat" plans acts as an integration clause and limits the litigants to the plan documents).

No case law supports this creative argument.  That a "top hat" plan may be partially or totally oral does not support the proposition that it <u>cannot</u> be written and merged.  The case law suggests only that portions of a "top hat" plan "can" be oral, not that every oral representation "must" be included in the Plan.  <u>Id.</u>

Consequently, we agree with the Defendants that the Deferred Compensation Plan documents can and do preclude consideration of the alleged oral modification.

c.    <u>Conflict with plan purpose</u>

Further, even if the Deferred Compensation Plan did permit oral modification, it did not permit the modification of the Plan as requested by the Accardi Plaintiffs.  Section 9.1(e) of the Master Trust Agreement specifically provides that the Trust could not be amended in a manner that would cause the Plan participants and beneficiaries to be taxed on their benefits in any year other than the year in which the benefits are received.  (Master Trust Agreement at § 9.1(e)).  If the Trust was amended to be fully funded, as the Accardi Plaintiffs assert it was, it would have caused the Deferred Compensation Plan to be a funded plan under ERISA thereby triggering the taxation of benefits in the year in which the compensation was deferred rather than the year in which

18

the benefits are ultimately paid by the Debtors.  This would be contrary to the express provisions of section 9.1(e).

Therefore, we conclude that the oral promise, even if made, cannot modify the Plan to destroy its purpose.

### d.   Oral modification insufficient

Even if the oral representation was made and was considered a term of the Deferred Compensation Plan, the Accardi Plaintiffs would not prevail in establishing that the Deferred Compensation Plan was a funded plan.  If the Debtors had placed funds in the Trust when the risk of bankruptcy arose, the Plaintiffs still would have had no right to those specific assets.  The Deferred Compensation Plan documents all provide that the Plan participants have no greater right to the funds in the Deferred Compensation Plan or Trust than general unsecured creditors.

Further, even the oral representation that the Deferred Compensation Plan participants would be paid in full would not establish entitlement to specific funds or create a funded plan. This representation cannot create a right in any specific assets any more than a representation to pay a trade creditor creates a trust in specific assets of a debtor.  Thus, the Accardi Plaintiffs have failed to establish any facts which would support anything other than a general unsecured claim against the Debtors.

Therefore, we conclude that, even assuming the facts

19

asserted by the Accardi Plaintiffs that the oral representation
was a modification of the Deferred Compensation Plan, they have
failed to establish that the Deferred Compensation Plan was a
funded plan.  Consequently, the Defendants are entitled to
dismissal of the Second Amended Complaint.

B.    Counts against Committee

In the Second Amended Complaint, the Accardi Plaintiffs
allege that the individual members of the Deferred Compensation
Committee are liable to them as well.  The Accardi Plaintiffs
assert that the implied duty of good faith and fair dealing
required the Deferred Compensation Committee to cause the Debtors
to fund the Trust for their benefit.  The Defendants disagree
because the funding of the Trust would have destroyed the express
purpose of the Plan which was to defer the payment of taxes.
They argue that the implied covenant of good faith and fair
dealing cannot be used to imply a duty to act in a manner that is
contrary to the express terms of the contract.  See, e.g.,
Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-
92 (3d Cir. 2000).

We agree with the Defendants.  The Deferred Compensation
Committee had no duty to cause the Debtors to fund the Plan if it
would have destroyed the very purpose of the Plan.  Further, even
if the Committee had caused the Debtors to fund the Plan or the
Trust, that would have created no right to those funds in favor

20

of the Accardi Plaintiffs.  The Deferred Compensation Plan documents all clearly provide that the Plan participants have no greater rights to the Plan and Trust assets than a general unsecured creditor.  Thus, they have failed to state a cause of action against the Committee members and the Complaint must be dismissed as to them as well.

    C.    State Law Claims

    The Accardi Plaintiffs have also sued for recovery under the Pennsylvania Wage Payment and Collection Law ("WPCL") and for tortious interference with contract.  The Defendants assert that these state law claims are preempted by ERISA.  The Defendants argue that regardless of whether the Deferred Compensation Plan is a top hat plan, it is still covered by the ERISA preemption principles.  See 29 U.S.C. §§ 501-07; New Valley, 89 F.3d at 149; Olander v. Bucyrus-Erie Co., 187 F.3d 599, 604 (7th Cir. 1999).

    Courts have generally held that, to the extent that recovery is sought of sums deferred under employee benefit plans, ERISA preempts claims under the WPCL as well as claims for tortious interference.  See, e.g., Kuhl v. Lincoln Nat'l Health Plan of Kansas City, Inc., 999 F.2d 298 (8th Cir. 1993) (tortious interference with right to contract claim preempted); McMahon v. McDowell, 794 F.2d 100, 106 (3d Cir. 1986) (WPCL claim preempted); Feret V. Corestates Fin. Corp., No. Civ. A. 97-6759, 1998 WL 426560, at *8 (E.D. Pa. July 27, 1998) (same); Valentine

                            21

v. Carlisle Leasing Int'l Co., 1998 WL 690877, at *5 (N.D.N.Y.
Sept. 30, 1998) (tortious interference claim preempted); Jones v.
Baskin Flaherty Elliott & Mannino, P.C., 788 F. Supp. 878, 879
(W.D. Pa. 1992) (WPCL claim preempted).

Thus, it is clear that the counts for violation of the WPCL
and for tortious interference with contract have been preempted
and dismissal is warranted.


IV.    CONCLUSION

For all the foregoing reasons, we grant the Defendants'
Motion to Dismiss the Second Amended Complaint filed by the
Accardi Plaintiffs and the counterclaim filed by Bookspan.

Appropriate orders are attached.

                                    BY THE COURT:

Dated: February 3, 2004             _____
                                    Mary F. Walrath
                                    United States Bankruptcy Judge